PEOPLE v CRAWL

Docket No. 56294. Argued January 5, 1977 (Calendar No. 7).—Decided August 29, 1977.

Claude E. Crawl was convicted by a jury in Recorder's Court of Detroit, Elvin L. Davenport, J., of first-degree murder in the perpetration of a robbery. The defendant's alleged accomplice, Harold Wilson, was convicted, on his plea of guilty, of second-degree murder, and testified for the prosecution at Crawl's trial. Defendant argues, among other issues, that a pistol and cartridges introduced into evidence were obtained as the result of an illegal search and seizure of a barber tool bag found in the apartment where he was arrested; and that refusal to give an instruction to the jury on second-degree murder was erroneous. The Court of Appeals, J. H. Gillis, P. J., and McGregor and Adams, JJ., affirmed (Docket No. 13529). Defendant appeals. *Held:* The conviction of first-degree murder is reversed and the case remanded for entry of a judgment of conviction of second-degree murder, or, upon motion of the prosecutor, a new trial for first-degree murder.

Justice Coleman, joined by Justice Ryan, would remand to the trial court for entry of a judgment of conviction of second-degree murder and for resentencing because the court refused the defendant's request to instruct the jury on second-degree murder. However, she did not agree that the police search was

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 11] 40 Am Jur 2d, Homicide §§ 496, 525.
   75 Am Jur 2d, Trial §§ 588, 589.
[2, 3, 5–9, 13] 68 Am Jur 2d, Searches and Seizures §§ 37, 92.
   Constitutionality of searching premises without search warrant as incident to valid arrest. 23 L Ed 2d 966.
[4] 68 Am Jur 2d, Searches and Seizures § 89.
[6] 40 Am Jur 2d, Homicide § 559.
[10] 40 Am Jur 2d, Homicide § 45.
[12] 68 Am Jur 2d, Searches and Seizures §§ 35, 36.
[14] 5 Am Jur 2d, Appeal and Error § 545.
[15] 5 Am Jur 2d, Appeal and Error § 566.
[16] 29 Am Jur 2d, Evidence § 539.
[17] 81 Am Jur 2d, Witnesses §§ 498, 522, 560.

unjustified or illegal. The lack of control by the police and the danger of the situation justified proceeding to search the bedroom without first obtaining a search warrant. To have delayed would have needlessly endangered the lives of police officers. The limits on the scope of searches without warrants established by the United States Supreme Court cases, on which Justice Levin's opinion relies, do not come into play until arrests have been made and the police are in control of the situation. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Three persons besides the defendant, one of whom could have been the third participant in the robbery and murder reported to the police, were milling or running around the apartment where the defendant was arrested, and one of the handguns used in the crime had not been found. The search conducted in the instant case was quite limited in scope and occurred contemporaneously with a situation dangerous to the officers' lives, and was reasonable under exigent circumstances.

Justice Williams, with Justice Blair Moody, Jr., concurring, also would remand to the trial court for entry of a judgment of conviction of second-degree murder and for resentencing. Although he agreed with Justice Levin's analysis of the present law of search and seizure, he dissented from a finding on these facts that the search of the bedroom and the seizure of the gun was violative of the law. The police testified that they searched under the circumstances that people were "milling all over the place", that the rooms were in close proximity, and that it was a night search for murderers in a building where "they had had trouble, * * * shootings, that sort of thing." On this record a "protective" search was justified and reasonably necessary for self-protection and the safety of the other police officers.

Justice Levin, with the Chief Justice and Justice Fitzgerald concurring, wrote that:

1. Although a search without a warrant may be conducted incident to a lawful arrest, an arrest made outside an arrestee's residence does not justify a subsequent search of the residence. However, even assuming it was lawful to conduct a "protective" search of an apartment following the defendant's arrest outside, the search without a warrant of a barber tool bag discovered in that search and the seizure of its contents were not within any of the narrowly circumscribed exceptions to the warrant requirement of the Michigan and United States Constitutions. The arresting officer had determined that no one was

in the room where the bag was found who might destroy evidence or use a weapon that might be contained in the bag. The revolver and cartridges seized from the bag were not in plain view as the officer searched for a suspect in the room. There were no circumstances, exigent or otherwise, justifying the search of the bag and the seizure of its contents without a warrant.

2. Refusal of defense counsel's request for instructions to the jury on second-degree murder as a lesser included offense of first-degree (felony) murder was erroneous. If this were the only error, the conviction could be affirmed as one of second-degree murder and the case remanded for resentencing unless the prosecutor opts for a new trial for first-degree murder. Since allowing introduction of evidence obtained during an impermissible search and seizure affects the validity of a conviction of second-degree murder, the defendant is entitled to a new trial.

3. The defendant's assigned counsel did not brief the search and seizure issue in the Court of Appeals. That failure was a serious mistake. The rule requiring presentation of appellate issues first to the Court of Appeals is of no greater dignity than the constitutional prohibition of unreasonable searches and seizures. If an accused person's right to protection against impermissible searches and seizures can be waived by the carelessness or ineptitude of counsel, then, by like principle, the rule requiring that appellate issues be presented first to the Court of Appeals can be waived by the prosecutor's failure timely to call the Court's attention to noncompliance with this rule.

4. The prosecutor was entitled to rebut the implication that testimony by the defendant's alleged accomplice was motivated by self-interest with evidence showing the nature of the concessions made to the witness, who had admitted his participation in the matter by pleading guilty of second-degree murder and had been sentenced. The disclosure should, however, be full and complete to avoid misleading the jury, for example, by showing that he was still subject to the jurisdiction of the parole board.

Reversed and remanded for further proceedings.

## DECISION OF THE COURT

1. HOMICIDE—FIRST-DEGREE MURDER—INSTRUCTIONS TO JURY.

A conviction of first-degree murder in the perpetration of a robbery is reversed and the case remanded for entry of a judgment of conviction of second-degree murder, or, upon motion of the prosecutor, a new trial for first-degree murder where

the trial court refused a request to instruct the jury on second-degree murder (MCL 750.316, 750.317; MSA 28.548, 28.549).

OPINION BY COLEMAN, J.

RYAN, J.

2. SEARCHES AND SEIZURES—WITHOUT A WARRANT—PROTECTIVE SEARCHES—INCIDENT TO ARREST.

*A search by police, limited to the discovery and opening of a barber tool bag in an apartment bedroom, which occurred contemporaneously with an arrest of a suspect in a robbery and shooting, was not unreasonable or illegal because lack of control by the police and the danger of the situation justified proceeding without a search warrant where three other persons, one of whom could have been another participant reported in the crime, were milling or running around the small apartment, and one of the handguns used in the crime had not been found (US Const, Am IV).*

3. SEARCHES AND SEIZURES—WITHOUT A WARRANT—PROTECTIVE SEARCHES—INCIDENT TO ARREST.

*The limits on the scope of searches incident to arrest without a warrant established by the United States Supreme Court do not come into play until arrests have been made and the police are in control of the situation (US Const, Am IV).*

4. SEARCHES AND SEIZURES—WITHOUT A WARRANT—PROTECTIVE SEARCHES.

*The Fourth Amendment does not require police officers to delay in the course of an investigation to obtain a search warrant if to do so would gravely endanger their lives or the lives of others (US Const, Am IV).*

5. SEARCHES AND SEIZURES—WITHOUT A WARRANT—PROTECTIVE SEARCHES.

*The sanctity of the home is an important value that must be protected; however, other values must be weighed in the balance according to the circumstances of each case challenging a search without a warrant, such as the value of protecting police officers' lives and of bringing a dangerous felon to the bar of justice (US Const, Am IV).*

6. APPEAL AND ERROR—PRESERVING QUESTION—INSTRUCTIONS TO JURY.

*A defendant convicted of first-degree (felony) murder should receive the benefit of a Supreme Court decision and his case should be remanded for entry of a conviction of second-degree*

*murder and for resentencing on the ground that the trial court refused the defendant's request to instruct the jury on second-degree murder where the defendant's appeal was held in abeyance by the Court pending the decision of that issue in another case.*

Opinion Concurring in Part by Williams, J.

Blair Moody, Jr., J.

7. Searches and Seizures—Without a Warrant—Protective Searches.

*"Protective" searches of a residence without a warrant may be justified when reasonably necessary to prevent the danger that a suspect at large in the residence may resist or escape; however, once all persons occupying the residence are under supervision and control and there is no reason to believe that anyone else is present, the rationale for a "protective" search no longer obtains and a further search may not be conducted (US Const, Am IV).*

8. Searches and Seizures—Without a Warrant—Protective Searches.

*A "protective" search of a room in an apartment by a police officer was justified and reasonably necessary for self-protection and the safety of other police officers where police testified that the persons occupying the apartment were "milling all over the place", that the rooms were in close proximity, and that it was a night search for murderers in a building where "they had had trouble, * * * shootings, that sort of thing" (US Const, Am IV).*

Opinion by Levin, J.

Kavanagh, C. J., and Fitzgerald, J.

9. Searches and Seizures—Without a Warrant—Protective Searches—Plain View—Exigent Circumstances.

*A revolver and cartridges seized from a barber tool bag in an apartment was obtained by an impermissible search and seizure without a warrant, assuming it was lawful to conduct a "protective" search of the apartment following the arrest of a defendant outside, where the arresting officer had determined that no one was in the room who might destroy evidence or use a weapon that might be contained in the bag, and the evidence seized was not in plain view as the officer searched for a suspect in the bedroom (US Const, Am IV; Const 1963, art 1, § 11).*

10. HOMICIDE—FIRST-DEGREE MURDER—LESSER INCLUDED OFFENSES.

There are lesser included offenses of felony murder; second-degree murder is always a lesser included offense of first-degree murder (MCL 750.316, 750.317; MSA 28.548, 28.549).

11. HOMICIDE—FIRST-DEGREE MURDER—LESSER INCLUDED OFFENSES—INSTRUCTIONS TO JURY.

In every trial for first-degree murder, including felony murder, the court is required to instruct the jury sua sponte, even over objection, on the included offense of second-degree murder (MCL 750.316, 750.317; MSA 28.548, 28.549).

12. SEARCHES AND SEIZURES—WARRANT REQUIREMENT.

The primacy of the search warrant requirement is well established; the most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject to only a few specifically established and well delineated exceptions which are "jealously and carefully drawn" (US Const, Am IV).

13. SEARCHES AND SEIZURES—WITHOUT A WARRANT—INCIDENT TO ARREST.

An arrest made outside an arrestee's residence does not justify a subsequent search of the residence, although a search without a warrant may be conducted incident to a lawful arrest (US Const, Am IV).

14. APPEAL AND ERROR—PRESERVING QUESTION.

Ordinarily the Supreme Court will not consider an issue that has not been preserved at the trial level and presented to the Court of Appeals; requiring preservation of error at the trial level provides the trial judge an opportunity to rule correctly and to avoid unnecessary retrials, and also provides a record for appellate review.

15. SEARCHES AND SEIZURES—APPEAL AND ERROR—PRESERVING QUESTION.

The rule requiring presentation of appellate issues first to the Court of Appeals is of no greater dignity than the constitutional prohibition of unreasonable searches and seizures; if an accused person's right to protection against impermissible searches and seizures can be waived by the carelessness or ineptitude of counsel, then, by like principle, the rule requiring that appellate issues be presented first to the Court of Appeals can be waived by the prosecutor's failure timely to call the Court's attention to noncompliance with this rule.

16. CRIMINAL LAW—EVIDENCE—ACCOMPLICES—CONVICTION.

*An accomplice's plea of guilty or his conviction following a trial is not admissible against another person.*

17. CRIMINAL LAW—WITNESSES—ACCOMPLICES—IMPEACHMENT—PLEA OF GUILTY.

*A prosecutor was entitled to rebut an implication raised on cross-examination that testimony by an accused's alleged accomplice was motivated by self-interest with evidence showing the nature of the concessions made to the witness, who had admitted his participation in a felony murder by pleading guilty of second-degree murder and had been sentenced; the disclosure should, however, be full and complete to avoid misleading the jury, for example, by showing that he was still subject to the jurisdiction of the parole board.*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Research, Training & Appeals, and *Robert A. Reuther,* Assistant Prosecuting Attorney, for the people.

*State Appellate Defender Office* (by *Chari Grove; Steven L. Schwartz,* of counsel) for defendant.

COLEMAN, J. *(reversing in part, affirming in part).* Because this case was administratively held in abeyance pending the decision in *People v Carter,* 395 Mich 434; 236 NW2d 500 (1975), I concur in the result reached by Justice LEVIN in part I of his opinion. The defendant's case should be remanded to the trial court for entry of a judgment of conviction for second-degree murder and for resentencing.[1]

---

[1] Justice LEVIN's opinion is dicta to the extent that it attempts to decide whether the holding in *People v Carter* is to be retroactively applied to cases preceding *Carter* that were not held in abeyance for the decision in that case. It should also be noted that none of the cases cited by Justice LEVIN in footnote 2 of his opinion discussed whether *Carter* should be retroactively applied to nonabeyance cases. All of the cited cases were decided by peremptory orders and there-

I cannot agree with Justice LEVIN that Sergeant Ewald's cursory search of the bedroom during a potentially life-endangering situation while the occupants of the apartment were not yet under police control was unjustified or illegal. He acted reasonably to protect the lives of his fellow officers.

I

At approximately 9 p.m. on May 11, 1971, Detective Sergeants Edward Ewald and Lawrence Kelly of the Detroit police department received a radio message directing them to investigate a robbery and shooting at a Detroit bar. They arrived at the bar at approximately 9:15 p.m. There they were told that sometime between 8:30 p.m. and 8:50 p.m. two men armed with handguns had robbed the bar and killed the bartender. One of the handguns used in the crime had already been recovered. They were also told that one of the robbers had been wounded, captured and taken to Detroit General Hospital.

At approximately 11:30 p.m. Ewald and Kelly went to the hospital and spoke with the wounded robber. He told them that the other robber's name was Claude Crawl and that Crawl was the one who had shot the bartender. He gave them a rough description of Crawl and the address of an apartment in Highland Park where Crawl could be found. He also said a third man was involved in the robbery, but he did not name or describe the man or say where the man could be found.

Ewald and Kelly left the hospital and radioed the Highland Park police department for assist-

fore should not be interpreted as controlling precedents on the issue of *Carter's* retroactivity. The question of the extent of *Carter's* retroactivity is still open.

ance. Soon a Highland Park scout car with three uniformed officers joined them and the group drove towards the Highland Park address where Crawl was said to be. They arrived at the address shortly after midnight.

The address was a two-story apartment building. The wounded robber had said Crawl would be in apartment 204. The Highland Park officers warned Ewald and Kelly that there had been trouble, including shootings, at this apartment building in the past. One Highland Park officer drove the scout car into an alley behind the building and remained with the car. Ewald, Kelly and the remaining Highland Park officers approached the building's front entrance. They pinpointed the location of apartment 204. Ewald positioned himself in an alcove from which he could observe the apartment's windows and the front of the building. Kelly and the two officers continued upstairs to the apartment.

When Kelly and the two officers reached the apartment, Kelly knocked on the door. One of the occupants of the apartment opened the door and admitted the three policemen into a small hallway. Straight ahead the hallway led to the living room and kitchen. Three steps from the door on the left side of the hallway was the entrance to a small bedroom. The occupants were scurrying all through the apartment. The three policemen ran through the apartment looking for Crawl and trying to bring the occupants under control.

Meanwhile, Ewald observed from his position downstairs a man climb out one of the apartment's windows and jump to the ground. Ewald shouted for the man to halt and identified himself as a police officer. The man walked a few steps and then halted. Ewald determined that the man was

Claude Crawl, placed him under arrest and ordered him back to the apartment.

Approximately two minutes after Kelly and the two officers were admitted to the apartment, Ewald and Crawl appeared at the door. The door was open and Ewald directed Crawl, who was now handcuffed, inside. Ewald turned Crawl over to the control of one of the officers. Another man and two women were in the living room. They were milling or running around. There was much confusion. Kelly and the other officer were trying to persuade the occupants to sit down and stay still. At this point, Ewald looked in the bedroom. No one was there. Ewald then looked under or on the bed and saw a small black barber's case.[2] He opened the unlocked case and found a chrome plated handgun, live and spent shells, barber's tools and identification cards belonging to Crawl. Ewald did not look anywhere else in the bedroom. He seized the case and its contents, and took these items to police headquarters along with Crawl and the three occupants, who had been arrested on narcotics charges. Crawl was charged with first-degree murder after confessing to the crime.

Before trial, Crawl filed a motion to suppress the items seized at the apartment. After an evidentiary hearing, the motion was denied. The items were admitted into evidence against Crawl at his trial. Several witnesses identified the gun as looking like one of the guns used in the robbery. A ballistics expert testified that tests run on the gun and bullets found at the scene of the robbery showed that the gun was used in the robbery. Crawl testified that he was a barber. The identification cards found with the gun were Crawl's.

---

[2] Ewald originally said he saw the case "under" the bed, but thereafter consistently testified that he saw it lying on top of the bed when he looked in the bedroom.

## II

Justice LEVIN contends that at the point Sergeant Ewald entered the bedroom there was no justification for seizing and opening the barber's case. He says that "there was no danger that anyone in the apartment could grab the bag and * * * make use of any weapon contained in the bag". I respectfully disagree.

When Sergeant Ewald captured Crawl outside the apartment, he was not thereby prohibited from returning to the apartment to assist his fellow officers. When he entered the apartment, about two minutes after the raid began, the situation was not under police control. An unidentified man and two women were milling or running around the living room of this small apartment. There was a great deal of confusion. The man could have been the third robber. The other handgun used in the crime was not accounted for. The officers had every reason to believe they were in a life-endangering situation. There had been trouble, including shootings, at this apartment building in the past. It was dark and late at night. They were looking for a murderer and an accomplice who might well be prepared to kill again.

Under these circumstances, I cannot say that Sergeant Ewald's cursory search was unreasonable or illegal. The lack of police control and the dangerousness of the situation justified his proceeding without first obtaining a search warrant. To have delayed would have needlessly endangered the lives of his fellow officers.

Justice LEVIN relies heavily upon *Chimel v California,* 395 US 752; 89 S Ct 2034; 23 L Ed 2d 685 (1969), and *United States v Chadwick,* 433 US 1; 97 S Ct 2476; 53 L Ed 2d 538 (1977), to support his

conclusion that the search in this case was illegal. The limits on the scope of warrantless searches established by these cases do not come into play until arrests have been made and the police are in control of the situation.

In *Chimel,* three policemen were admitted to the defendant's home by the defendant's wife and waited for the defendant to return from work. When he arrived, the police arrested him for burglary of a coin shop. Then, accompanied by the defendant's wife, the police conducted a detailed 45-minute search of every room in the house. In *Chadwick,* federal officers seized a double-locked footlocker they suspected to contain marijuana. The footlocker was transported to a Federal police building where it was locked in an evidence storage room. A few hours later, at their convenience, the officers opened and searched the footlocker.

Neither *Chimel* nor *Chadwick* involved uncontrolled and potentially life-endangering situations like the situation in the case at bar. Also, the searches in those cases were much more intrusive than the quick, protective search undertaken here. Thus, I do not find either of these cases to be controlling or convincing precedents.

The case at bar is much more like *Warden, Maryland Penitentiary v Hayden,* 387 US 294; 87 S Ct 1642; 18 L Ed 2d 782 (1967). There the police were told that an armed robber had just entered a certain address. The police went to the address, a two-story house, and knocked on the door. A woman answered the door and admitted the police. The police knew the robber was armed, but they did not know where in the house he was. They immediately fanned out through the house looking for the robber and for weapons. In the course of the next few minutes, one policeman found the

robber in an upstairs bedroom and arrested him. Ammunition for a handgun and a cap worn by the robber during the robbery were found underneath the mattress of the robber's bed and ammunition for a shotgun was found in a bureau drawer. A sawed-off shotgun and a handgun were found on the main floor inside a toilet flush tank and clothing worn by the robber during the robbery was found in the basement inside a washing machine. The United States Supreme Court upheld the search for and seizure of all these items, saying:

"They [the police] acted reasonably when they entered the house and began to search for a man * * * and for weapons which he had used in the robbery or might use against them. *The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential,* and only a thorough search of the house for persons and weapons could have insured that [the robber] was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." *Warden v Hayden, supra,* 298–299. (Emphasis added.)

In the case at bar, although the police knew where Crawl was and had already arrested him, three other persons, one of whom could have been the third participant in the robbery and murder, were milling or running around the small apartment. The situation was not under control. The police had every reason to believe that their lives were in danger. Sergeant Ewald's cursory search, limited to the discovery and opening of the barber's case (a logical place to hide a small handgun), was a minor intrusion into the defendant's privacy necessary to insure that the police had control of the other handgun used in the robbery

so that it could not be used against them by one of the three persons not yet under police control or arrest.

Justice Levin suggests that the police had other alternative courses of action that could have insured their safety just as well. Upon leisurely reflection, that may or may not seem true. However, we must remember that a police officer acting in a crisis situation does not enjoy the luxury of calm contemplation and collegial discussions before he or she must make on-the-scene decisions that may mean the difference between life and death.

Obviously, a line must be drawn somewhere. The sanctity of the home is an important value that must be protected. In drawing a line, however, other values must be weighed in the balance. The value of protecting police officers' lives and of bringing a dangerous felon to the bar of justice are two that come to mind. These values must be carefully weighed according to the circumstances of each case.

Here, the search was quite limited in scope and it occurred contemporaneously with an ongoing situation potentially dangerous to the officers' lives. The officers did not know what they would be facing when they entered the apartment. Sergeant Ewald only looked in one very logical place, the barber's case laying on the bed, to find the missing handgun. The handgun and shells used in the crime were, in fact, in the case. He well could have judged that the security of all depended on finding and seizing the gun. In his place, I believe that my reaction would have been the same.

Sergeant Ewald acted reasonably under exigent circumstances. I would not draw the line as finely or as narrowly as Justice Levin has done today.

Neither legal precedent nor moral values nor the need for a lesson to the police in self-restraint require a complete reversal of the defendant's conviction on the basis of this search and seizure.

None of the other issues raised by the defendant warrant a complete reversal and the granting of a new trial. However, because his case was held in abeyance for the decision in *People v Carter, supra,* on the procedural issue of whether instructions on second degree murder must be given in felony murder cases, and because he requested such instructions at trial, he should receive the benefit of the *Carter* decision. Therefore, I would remand to the trial court for resentencing on a conviction of second-degree murder, or, upon the motion of the prosecutor for a new trial on the original charge of first-degree murder.

RYAN, J., concurred with COLEMAN, J.

WILLIAMS, J. *(concurring in part; dissenting in part).* I concur in the view that, under *People v Carter,* 395 Mich 434; 236 NW2d 500 (1975), this case should be remanded to the trial court for entry of a judgment of conviction of second-degree murder and for resentencing accordingly, with the option in the prosecutor, if the ends of justice would be better served and upon notification of the trial court before resentencing, to have the judgment and conviction vacated and defendant retried for first-degree murder. (See the opinion of LEVIN, J., footnote 2.) I concur that the search of the bedroom and the seizure of the gun were not violative of the law.

Although I find Justice LEVIN's analysis of the present law of search and seizure both complete and accurate, my analysis of the facts is different from his and closer to that of Justice COLEMAN.

Justice Levin states (at page 24 of his opinion) that:

"While warrantless 'protective' searches may be justified when 'reasonably * * * necessary to prevent the dangers that [a] suspect at large in the house may resist or escape', *Warden, Maryland Penitentiary v Hayden,* 387 US 294, 299; 87 S Ct 1642; 18 L Ed 2d 782 (1967), *once all persons occupying the residence are under supervision and control* and there is no reason to believe that anyone else is present, the rationale for a 'protective' search no longer obtains and a further search may not be conducted." (Emphasis added.)

As I understand the record, "all persons occupying the residence" were not "under supervision and control" when Sergeant Ewald found the gun, and he had reason to so believe. Sergeant Ewald testified that on entering the apartment "I set Mr. Crawl down and one of the officers stayed with him and we looked around the rest of the apartment to see if there [were] any other people there". He testified that when he entered "[t]hey were milling all over the place and the officers were trying to get them to sit down and stand still". Officer Kelly corroborated this, saying on admittance "people started scurrying all over the apartment * * * they were scurrying in the bedrooms, kitchen and et cetera, and then Sergeant Ewald returned a minute or two after we had entered the apartment with * * * Claude Crawl in custody."[1]

---

[1] Officer Kelly later testified "Well, we had everybody calmed down a gun was found by Sergeant Ewald in the bedroom where the people had ran * * *". From this testimony, it is difficult to ascertain the exact sequence of events, but a complete reading of the testimony leads to the conclusion that the nature of the situation as a whole, in light of the proximity of the rooms, was one of confusion and danger at the time Sergeant Ewald left in search and at the time of locating the gun.

In short, under these circumstances of "milling all over the place" and the close proximity of the rooms, especially at night in search of murderers and in a building where "they have had trouble * * * shootings, that sort of thing", I find that a "protective" search was justified and reasonably necessary for self-protection and the safety of the other officers.

All other issues raised on appeal are without merit.

Conviction of first-degree murder reversed with remand for entry of a judgment of conviction of second-degree murder, reserving the option in the prosecutor to have the judgment and conviction vacated and to re-try defendant for first-degree murder.


BLAIR MOODY, JR., J., concurred with WILLIAMS, J.


LEVIN, J. Claude Crawl was convicted of first-degree murder[1] for the killing of a bartender during a robbery of a Detroit bar. The Court of Appeals affirmed. 47 Mich App 749; 209 NW2d 809 (1973).

We conclude that there was error in refusing to instruct on second-degree murder and in allowing introduction of evidence obtained during an impermissible search and seizure.

If the only error was a failure to instruct on second-degree murder, Crawl's conviction could be affirmed as second-degree murder with remand for resentencing unless the prosecutor opts for a new trial on first-degree murder. Since there is other error which affects the validity of a conviction of

[1] MCLA 750.316; MSA 28.548.

second-degree murder, Crawl is entitled to a new trial.

Evidence seized from a barber bag in an apartment was introduced at trial over objection. Assuming it was lawful, following Crawl's arrest outside the apartment, to conduct a "protective" search of the apartment, the warrantless search of the barber bag discovered in that search and the seizure of its contents were not within any of the narrowly circumscribed exceptions to the warrant requirement of Const 1963, art 1, § 11 and the Fourth Amendment. The arresting officer had determined that no one was in the bedroom who might destroy evidence or use a weapon that might be contained in the bag. The evidence seized (a revolver and shells) was not in plain view as the officer searched for a suspect in the bedroom. There were no circumstances, exigent or otherwise, justifying the warrantless search of the bag and the seizure of its contents.

## I

In *People v Carter,* 395 Mich 434, 437; 236 NW2d 500 (1975), this Court held "that there are lesser included offenses to first-degree felony-murder. Second-degree murder is always a lesser included offense of first-degree murder". In the companion case of *People v Jenkins,* 395 Mich 440, 442–443; 236 NW2d 503 (1975), this Court declared that: "in every trial for first-degree murder, including felony murder, the trial court is required to instruct the jury *sua sponte,* and even over objection, on the lesser included offense of second-degree murder" but added that "[t]his decision shall apply to this case and to all cases tried after January 1, 1976".

In a number of subsequent decisions, this Court,

pursuant to *Carter,* modified pre-*Carter,* pre-*Jenkins* convictions of first-degree felony-murder, where the issue was preserved at the trial level by objection or request to charge on second-degree murder, by reducing the degree of conviction from first- to second-degree murder and remanding for resentencing with an option in the prosecuting attorney, if he is "persuaded that the ends of justice would better be served, upon notification to the trial court before resentencing", to have the judgment and conviction vacated and a new trial for first-degree murder.[2]

In this case, the judge refused defense counsel's "request that your Honor charge second-degree murder". The judge's ruling was erroneous. *People v Carter, supra.*

## II

Two men[3] robbed a Detroit bar at approximately 8:30 p.m. on May 11, 1971. The bartender was fatally shot when he offered resistance. Howard Wilson, one of the robbers, was wounded in the shootout and taken to a hospital. He informed the police, about 45 minutes after the robbery, that Crawl and another man participated in the robbery and that Crawl could be found at his cousin's apartment.

The police arrived at the apartment building shortly after midnight. Officer Edward Ewald re-

---

[2] *People v Dancer,* 396 Mich 802; 238 NW2d 29 (1976); *People v Livingston,* 396 Mich 818; 238 NW2d 360 (1976); *People v Bills,* 396 Mich 819; 238 NW2d 803 (1976); *People v Dates,* 396 Mich 820; 238 NW2d 360 (1976); *People v Archie Smith,* 396 Mich 825; 238 NW2d 536 (1976); *People v Aaron,* 396 Mich 843; 239 NW2d 602 (1976); *People v Watson,* 396 Mich 870 (1976); *People v Delvin Jones,* 397 Mich 871 (1976); *cf. People v Herbert Smith,* 396 Mich 362; 240 NW2d 245 (1976).

[3] A third man, never apprehended, allegedly waited in a getaway car.

mained outside the building while Officer Larry
Kelly and two or three other officers entered the
building and proceeded to the apartment. Ewald,
standing outside, saw Crawl flee through a window
and arrested him after he descended.

Ewald took Crawl into the building and up to
the apartment, assertedly because Ewald was still
looking for a third suspect; according to Ewald,
"[i]t was an assumption that he could be there,
too".

As Ewald was arresting Crawl, Kelly and the
other officers went to the apartment, "knocked on
the door and we were admitted". The two women
and one man who were present "started running
around the apartment at that time".

When Ewald and Crawl entered the apartment,
the three other occupants were still "milling all
over the place and the officers were trying to get
them to sit down and stand still", but all three
were "[i]n the living room at the time". Crawl was
handcuffed and turned over to another officer.
Ewald entered a bedroom located about three steps
from the living room.

Conceding that Crawl and the three other per-
sons were in the living room when Ewald entered
the bedroom, the people argue that Ewald was
justified in entering the bedroom because Wilson
had told the officers that he and two other persons
had been involved in the robbery and a search was
necessary to determine whether the third robber
was in the apartment.

Ewald testified on direct examination that he
walked into the bedroom and found a barber bag
or small brief case *under* the bed; on cross-exami-
nation he testified that the bag was *on* the bed.
Ewald opened the bag and found and seized evi-
dence, including a revolver and spent shells, tend-

ing to connect Crawl with the robbery.[4] Crawl and the three other persons, who were arrested on narcotics charges, were then taken to police headquarters for questioning.

We would hold that Ewald was not justified in searching the barber bag and that the evidence seized was inadmissible.

"The primacy of the warrant requirement is well established." *People v Tyler,* 399 Mich 564, 571; 250 NW2d 467 (1977); *United States v Chadwick,* 433 US 1; 97 S Ct 2476; 53 L Ed 2d 538 (1977).[5] "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn.'" *Coolidge v New Hampshire,* 403 US 443, 454–455; 91 S Ct 2022; 29 L Ed 2d 564 (1971). Similarly, see *People v Reed,* 393 Mich 342, 362; 224 NW2d 867 (1975).

None of the recognized exceptions to the warrant requirement justified the search of the barber bag.

[4] The bag contained barber tools, a .38-caliber revolver, two live shells, four spent shells and a holster.

[5] "The judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime.' *Johnson v United States,* 333 US 10, 14 [68 S Ct 367; 92 L Ed 436] (1948). Once a lawful search has begun, it is also far more likely that it will not exceed proper bounds when it is done pursuant to a judicial authorization 'particularly describing the place to be searched and the persons or things to be seized.' Further, a warrant assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search. *Camara v Municipal Court,* 387 US 523, 532 [87 S Ct 1727; 18 L Ed 2d 930] (1967)." *United States v Chadwick,* 433 US 1; 97 S Ct 2476; 53 L Ed 2d 538 (1977).

Although a warrantless search may be conducted incident to a lawful arrest, an arrest made outside the arrestee's residence does not justify a subsequent search of the residence. *Vale v Louisiana,* 399 US 30; 90 S Ct 1969; 26 L Ed 2d 409 (1970).[6] The search of the bag was not an incident of Crawl's arrest.

Nor was the search an incident of the arrest of the other persons in the apartment. At the time of their arrest, no arrestee was in the bedroom and, therefore, the search was not in "the area from within which [the arrestee] might gain possession of a weapon or destructible evidence." "The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area." *Chimel v California,* 395 US 752, 763, 768; 89 S Ct 2034; 23 L Ed 2d 685 (1969).

An arrest in a residence does not justify a general search of the residence. There is no justification "for routinely searching any room other than that in which an arrest occurs—or, for that

[6] The Court said:

"A search may be incident to an arrest ' "only if it is substantially contemporaneous with the arrest and is confined to the *immediate* vicinity of the arrest." ' *Shipley v California,* 395 US 818, 819 [89 S Ct 2053; 23 L Ed 2d 732 (1969)]; *Stoner v California,* 376 US 483, 486 [84 S Ct 889; 11 L Ed 2d 856 (1964)]. If a search of a house is to be upheld as incident to an arrest, that arrest must take place *inside* the house, cf. *Agnello v United States,* 269 US 20, 32 [46 S Ct 4; 70 L Ed 145; 51 ALR 409 (1925)], not somewhere outside—whether two blocks away, *James v Louisiana,* 382 US 36 [86 S Ct 151; 15 L Ed 2d 30 (1965)], twenty feet away, *Shipley v California, supra,* or on the sidewalk near the front steps. 'Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant.' *Agnello v United States, supra,* at 33. That basic rule 'has never been questioned in this Court.' *Stoner v California, supra,* at 487, fn 5." (Emphasis by the Court.) *Vale v Louisiana,* 399 US 30, 33–34; 90 S Ct 1969; 26 L Ed 2d 409 (1970).

matter, for searching through all the desk drawers or other closed or concealed areas in the room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant." *Chimel, supra,* p 763.

We acknowledge that if the police officers had reason to believe that the other robber was in the apartment and might escape, endanger the officers or destroy evidence, they would have been justified in entering the bedroom to avoid those dangers.[7] Assuming then that Officer Ewald was justified in entering the bedroom,[8] once he determined that no one was in the bedroom[9] there was no justification

---

[7] *See Warden v Hayden,* 387 US 294, 299; 87 S Ct 1642; 18 L Ed 2d 782 (1967); *People v Block,* 6 Cal 3d 239; 103 Cal Rptr 281; 499 P2d 961 (1971); *United States v Broomfield,* 336 F Supp 179 (ED Mich, 1972). *Compare People v Olajos,* 397 Mich 629; 246 NW2d 828 (1976).

[8] In response to the question whether he had "information that the third man might be in the apartment", Ewald said, "[i]t was an assumption that he could be there too". It has been said that a protective search may not be conducted unless there is reason to believe that someone else is present. *United States v Gamble,* 473 F2d 1274 (CA 7, 1973); *United States v Carter,* 173 US App DC 54, 64–65; 522 F2d 666, 676–677 (1975); *Enzensperger v Solomon,* 16 Cr L Rep 4111 (CA 9, July 29, 1974, Nos 73-2407, 73-2383), not officially reported.

[9] While my colleague states that "three other persons, one of whom could have been the third participant in the robbery and murder, were milling or running around the small *apartment,*" elsewhere it is conceded that they "were in the *living room.* They were milling or running around." (Emphasis supplied.) The people conceded that Crawl and the three other occupants of the apartment were in the living room when Officer Ewald entered the *bedroom.* The people did not prove, and indeed, do not claim that they proved that any of the occupants of the apartment were milling or running around except in the living room. In contrast with *Warden v Hayden, supra,* p 299, when Ewald entered the bedroom no one was "at large" in the apartment.

My colleague states "[t]he situation was not under control. The police had every reason to believe that their lives were in danger", and that the limits on the scope of warrantless searches imposed by *Chimel v California,* 395 US 752; 89 S Ct 2034; 23 L Ed 2d 685 (1969), and *United States v Chadwick, supra,* "do not come into play until arrests have been made and the police are in control of the situation", and that those cases do not involve "uncontrolled and potentially life

for opening the bag. All four occupants (Crawl and the other three persons) were in the living room; there was no danger that anyone in the apartment could grab the bag and destroy it or any evidence in it or make use of any weapon contained in the bag. When the officers left the apartment, all four occupants were taken to police headquarters.

While warrantless "protective" searches may be justified when "reasonably * * * necessary to prevent the dangers that [a] suspect at large in the house may resist or escape", *Warden, Maryland Penitentiary v Hayden*, 387 US 294, 299; 87 S Ct 1642; 18 L Ed 2d 782 (1967), once all persons occupying the residence are under supervision and control and there is no reason to believe that anyone else is present, the rationale for a "protec-

endangering situations like the situation in the case at bar". Crawl, however, had been arrested and was in handcuffs when Ewald entered the bedroom. In addition to Ewald, there were at least three other police officers in the apartment, Kelly and two or three uniformed Highland Park policemen. It is idle to suggest that Kelly and the two or three other officers were not in "control" and did not so dominate the situation that none of the occupants could have entered the bedroom against the officers' will.

Even if the other man "could have been the third robber", he was in the living room, together with the two women and Crawl, and not within reach of the barber bag located in the bedroom. When Ewald determined that no one was in the bedroom, there was no justification for a warrantless search of furnishings or other belongings in the room.

The people had the burden of proving exigent circumstances, that in fact the "situation was not under control" and the officers had "reason to believe that their lives were in danger." The officers' testimony tends to show, rather, that when Ewald entered the bedroom they were in control and none of the occupants of the apartment represented any danger to them. There is no evidentiary support for a finding that the police were not in control.

The argument that the need to collect evidence probative of guilt ("bringing a dangerous felon to the bar of justice") is a factor in determining whether there is justification for a warrantless search is completely at odds with the history of adjudication under the Fourth Amendment and the concept that there are only " 'a few specifically established and well-delineated exceptions' * * * 'jealously and carefully drawn' " to the warrant requirement. *Coolidge v New Hampshire*, 403 US 443, 453–455; 91 S Ct 2022; 29 L Ed 2d 564 (1971).

tive" search[10] no longer obtains and a further search may not be conducted.

The warrantless search of the bag was not permitted under the "plain view" doctrine, whether the bag was under or on the bed. This doctrine permits warrantless searches and seizures where law enforcement officers come upon contraband, criminal activity or criminal evidence[11] which is in "plain view" of officers who are where they have a right to be when they see the evidence. *Stanley v Georgia,* 394 US 557; 89 S Ct 1243; 22 L Ed 2d 542 (1969) (Stewart, J.).[12] A search and seizure are justified "only where it is immediately apparent to the police that they have *evidence* before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges". (Emphasis supplied.) *Coolidge v New Hampshire, supra,* p 466. The doctrine "will not justify seizure of the object where the incriminating nature of the object is not apparent from the 'plain view' of the object."[13] Exploratory and gen-

---

[10] *See* cases cited in fn 8, *supra.*

[11] *See Warden v Hayden, supra,* pp 309–310, abolishing, for purposes of the probable cause requirement, the distinction between "mere evidence" (which could not be seized) and fruits of crime and contraband (which could be seized).

[12] Mr. Justice Stewart, joined by Justices Brennan and White, concurred on Fourth Amendment grounds in the suppression of films seized in a private residence. The majority held unconstitutional a state statute making private possession of obscene material a crime.

[13] Anno: *Search and Seizure: Observation of Objects in "Plain View",* 29 L Ed 2d 1067.

Evidence discovered in the course of lawful "protective" searches has been held admissible where the evidence itself was visible as the police officers searched for suspects in hiding. *See People v Block, supra* (plastic bag containing substance appearing to be marijuana on table and in open jewelry box in bedroom lawfully entered); *United States v Broomfield, supra* (guns and drugs visible in walk-in closet and on dresser in room officer had lawfully entered); *United States v Looney,* 481 F2d 31, 32–33 (CA 5, 1973) (machine gun on floor under bed); *United States v Briddle,* 436 F2d 4, 8 (CA 8, 1970) (shotgun on floor in bedroom).

eral searches to find evidence of crime are uncon-
stitutional. *United States v Lefkowitz,* 285 US 452,
466–467; 52 S Ct 420; 76 L Ed 877 (1932).[14] To fall
within the plain view doctrine, the discovery of
evidence "must be inadvertent." *Coolidge v New
Hampshire, supra,* p 469.

The *contents* of the barber bag, under or on the
bed, were not in "plain view" of Officer Ewald
when he surveyed the bedroom to determine
whether the other robber was present; there was
nothing "inadvertent" about his opening the bag
and discovering and seizing the contents.[15]

---

[14] The Court held that a search of the contents of a cabinet, some
desks and wastebaskets was too extensive to be justified as incident to
a lawful arrest, even though the furniture and wastebaskets were in
"plain view" at the time of the arrest.

[15] The people do not really contend that the revolver was in plain
view. Rather, they assert that "[t]he case was reasonably expected to
contain a revolver", *i.e.,* there was probable cause. The issue, how-
ever; is not whether there was probable cause but whether the police
were required to submit the evidence of probable cause to a magis-
trate for his independent determination:

"It is apparent that the agents in this case acted with restraint. Yet
the inescapable fact is that this restraint was imposed by the agents
themselves, not by a judicial officer. They were not required, before
commencing the search, to present their estimate of probable cause
for detached scrutiny by a neutral magistrate. They were not com-
pelled, during the conduct of the search itself, to observe precise
limits established in advance by a specific court order. Nor were they
directed, after the search had been completed, to notify the authoriz-
ing magistrate in detail of all that had been seized. In the absence of
such safeguards, this Court has never sustained a search upon the
sole ground that officers reasonably expected to find evidence of a
particular crime and voluntarily confined their activities to the least
intrusive means consistent with that end. Searches conducted without
warrants have been held unlawful 'notwithstanding facts unquestion-
ably showing probable cause,' *Agnello v United States,* 269 US 20, 30
[46 S Ct 4; 70 L Ed 145; 51 ALR 409 (1925)], for the Constitution
requires 'that the deliberate, impartial judgment of a judicial officer
* * * be interposed between the citizen and the police   * * * .' *Wong
Sun v United States,* 371 US 471, 481–482 [83 S Ct 407; 9 L Ed 2d 441
(1963)]. 'Over and again this Court has emphasized that the mandate
of the [Fourth] Amendment requires adherence to judicial processes,'
*United States v Jeffers,* 342 US 48, 51 [72 S Ct 93; 96 L Ed 59 (1951)],
and that searches conducted outside the judicial process, without
prior approval by judge or magistrate, are *per se* unreasonable under
the Fourth Amendment—subject only to a few specifically established

In *United States v Chadwick, supra,* p 15, the
United States Supreme Court, in holding that a
double-locked foot locker which had been loaded in
the trunk of an automobile could not be seized
without a warrant under either the "automobile
exception"[16] or as a search incident to an arrest,
declared: "Once law enforcement officers have re-
duced luggage or other personal property not im-
mediately associated with the person of the arres-
tee to their exclusive control, and there is no
longer any danger that the arrestee might gain
access to the property to seize a weapon or destroy
evidence, a search of that property is no longer an
incident of the arrest".[17]

On analogous facts, New York's intermediate
appellate court suppressed evidence obtained upon
a search of a dresser drawer and a suitcase in a
closet. The defendant had been arrested on the

---

and well-delineated exceptions." *Katz v United States,* 389 US 347,
356–357; 88 S Ct 507; 19 L Ed 2d 576 (1967).

[16] The Court explained:

"It is true that, like the footlocker in issue here, automobiles are
'effects' under the Fourth Amendment, and searches and seizures of
automobiles are therefore subject to the constitutional standard of
reasonableness. But this Court has recognized significant differences
between motor vehicles and other property which permit warrantless
searches of automobiles in circumstances in which warrantless
searches would not be reasonable in other contexts. *Carroll v United
States,* 267 US 132 [45 S Ct 280; 69 L Ed 543; 39 ALR 790] (1925) [first
recognizing the 'automobile exception' to the warrant requirement];
*Preston v United States* [376 US 364], at 366–367 [84 S Ct 881; 11 L
Ed 2d 777] (1964); *Chambers v Maroney,* 399 US 42 [90 S Ct 1975; 26
L Ed 2d 419] (1970). See also *South Dakota v Opperman,* 428 US 364,
367 [96 S Ct 3092; 49 L Ed 2d 1000] (1976)." *United States v
Chadwick, supra,* p 12.

The meaning of the *Carroll* rule and the scope of the so-called
automobile exception to the warrant requirement have continued to
divide the Court. *See United States v Chadwick, supra; Coolidge v
New Hampshire,* 403 US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971);
*Cardwell v Lewis,* 417 US 583; 94 S Ct 2464; 41 L Ed 2d 325 (1974).

[17] *Similarly, see Johnson v United States,* 333 US 10, 13–14; 68 S Ct
367; 92 L Ed 436 (1948); *Coolidge v New Hampshire, supra,* pp 449–
450; *Chimel v California, supra,* p 761; *Katz v United States, supra.*

street for possession of heroin. He told the arresting officers that the "people you want are up in my apartment". The Court held that, although the warrantless entry of the apartment and seizure of a shotgun in plain view in a room full of people were lawful, the search of the dresser drawer and suitcase was unlawful:

"The thorough search of the room, and the seizure therein of a pistol from a dresser drawer and of drugs and drug paraphernalia from a suitcase in a closet, after all persons had been cleared from the room, was impermissible (cf. *People v Floyd,* 26 NY2d 558, 563; 312 NYS2d 193, 195–196; 260 NE2d 815, 817 [1970]). There was no reason to fear an assault by a person with a weapon within reach, i.e., in the dresser, since there was no one in the room. Even though the officer could legally look into the closet to assure himself that no one who might harm him was hiding there, he had no right to open and examine the suitcase he found therein. Any weapons which might have been contained in the suitcase were certainly out of reach of the persons in the next room." *People v Thompson,* 50 App Div 2d 874, 875; 377 NYS2d 149, 151–152 (1975).

The warrant requirement embodies the fundamental precept that a search must be preceded by a neutral and objective determination of probable cause and of the proper scope of the search, "[B]ypassing a neutral predetermination of the *scope* of a search leaves individuals secure from Fourth Amendment violations 'only in the discretion of the police.'" *Katz v United States,* 389 US 347, 358–359; 88 S Ct 507; 19 L Ed 2d 576 (1967) (emphasis by the Court).

The exceptions to the warrant requirement are narrowly circumscribed and are available only where exigent circumstances *(e.g.,* the need to protect arresting officers, the likelihood of destruc-

tion of evidence or of escape) require immediate action, precluding a neutral determination of probable cause or of the scope of the search; "[t]here being no exigency, it was unreasonable for the Government to conduct this search without the safeguards a judicial warrant provides". *United States v Chadwick, supra,* p 11.

Having determined that no one was in the the bedroom who might destroy evidence or endanger the safety of the officers, the officers had no justification for opening the bag and seizing its contents. If upon sight of the bag there was reason to believe it contained evidence, the officers, after taking Crawl and the others into custody, should have sought a warrant to conduct a search. They could have done so without fear for their safety, or that anyone in the apartment would destroy evidence.

"We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. * * * And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home.' " *McDonald v United States,* 335 US 451, 455–456; 69 S Ct 191; 93 L Ed 153 (1948).[18]

---

[18] "The officers could have amply insured their safety by removing the defendant from the premises immediately. Therefore, the intrusion into the upstairs rooms which brought the police into view of the [seized evidence] was not supported by any of the recognized exceptions to the warrant requirement." *State v Ranker,* 343 So 2d 189, 195 (La, 1977).

The evidence seized was inadmissible. The error was not harmless.[19]

## III

While Crawl sought, before and at the trial, to suppress the evidence found in the barber bag, his assigned appellate counsel did not brief the search and seizure question in the Court of Appeals. Crawl's application for leave to appeal to this Court raised this question but the people's answer did not respond on search and seizure and did not direct our attention to the failure of Crawl's appellate counsel to raise the question in the Court of Appeals.

Ordinarily we will not consider an issue that has not been preserved at the trial level and presented to the Court of Appeals.

Requiring preservation of error at the trial level

---

[19] The testimony of accomplice Wilson was impeached by his self-interest; facing a charge of first-degree murder, he was permitted to plead guilty to second-degree murder and had been sentenced to serve 5 to 15 years; also pertinent is Wilson's post-conviction recanting affidavit.

Crawl's confession may have been a fruit of the unlawful search and seizure. *See* part V, *infra.*

Four persons in the bar testified at the trial: one could not identify Crawl; another said "he was not positive;" the third identified Crawl at trial but shortly after the incident had said he did not know if he could identify either robber; the fourth identification witness was the only person whose testimony unequivocally identified Crawl. Identification testimony is often unreliable. *See People v Anderson,* 389 Mich 155; 172–180, 205 NW2d 461 (1973). Unless there are special reasons to credit an identification (*i.e.,* long acquaintance between the witness and the defendant), such evidence does not point unerringly to the defendant and cannot make other error harmless.

The gun, illegally seized following the illegal search of the barber bag, was compelling evidence of Crawl's guilt; it cannot be said that without such evidence Crawl would have, nevertheless, inevitably been convicted of first-degree murder: A police firearms examiner testified that one bullet recovered from the scene of the robbery "was positively fired" by the gun, and that two other bullets bore "a very strong similarity." Three of the four eyewitnesses said that the gun looked like the one used by one of the robbers.

provides the trial judge an opportunity to rule correctly and to avoid unnecessary retrials, and also provides a record for appellate review. In this case, the search and seizure issue was preserved before and at the trial, an evidentiary record was developed and the trial court had an opportunity to suppress the evidence. The need for a new trial is not attributable to Crawl's failure to raise the issue, but, rather, to the people's proffer of inadmissible evidence and incorrect rulings by the trial court.

The rule requiring that appellate issues first be presented to the Court of Appeals seeks to lighten this Court's burden of decision by disposing of issues at the intermediate appellate level and by providing this Court with the benefit of the analysis and judgment of the Court of Appeals.

The failure of Crawl's appellate counsel to raise the search and seizure issue on appeal was a serious mistake. Appellate courts have considered claims based on the introduction of illegally seized evidence even where the issue was not preserved at the trial level where it appears there may be a different result at a new trial at which the evidence is not introduced.[20]

---

[20] *See Chambers v Maroney,* 399 US 42, 54, fn 11; 90 S Ct 1975; 26 L Ed 2d 419 (1970); *Kaufman v United States,* 394 US 217, 220, fn 3; 89 S Ct 1068; 22 L Ed 2d 227 (1969) (issue preserved at the trial level but not preserved on appeal to the intermediate appellate court); *People v Moore,* 391 Mich 426; 216 NW2d 770 (1974); *People v Degraffenreid,* 19 Mich App 702; 173 NW2d 317 (1969); *People v Steeneck,* 247 Mich 583, 586; 226 NW 231 (1929); *People v Johnson,* 38 Ill 2d 399, 402–403; 231 NE2d 447, 449 (1967); *People v Ibarra,* 60 Cal 2d 460; 34 Cal Rptr 863; 386 P2d 487 (1963); *State v Thomas,* — W Va —; 203 SE2d 445 (1974).

Other decisions of this Court recognizing that error not preserved at the trial level may, nevertheless, be considered on appeal include *People v Crittle,* 390 Mich 367, 370; 212 NW2d 196 (1973); *People v Kelsey,* 303 Mich 715, 719; 7 NW2d 120 (1942); *People v Holmes,* 292 Mich 212, 215; 290 NW 384 (1940); *People v Dorrikas,* 354 Mich 303, 326; 92 NW2d 305 (1958); and *People v Smith,* 260 Mich 486, 488–489; 245 NW 502 (1932). *See, also,* Josephson, *1971 Annual Survey of Law, Civil and Criminal Evidence,* 18 Wayne L Rev 101, 168 (1971).

For the same reasons that the failure of the trial judge to suppress this evidence was not harmless error,[21] it cannot be said that a new trial should not be granted because Crawl would inevitably be convicted of first-degree murder at a trial in which the evidence is suppressed.[22]

It would be disproportionate to regard the failure to raise this issue in the Court of Appeals as a waiver, and not to treat as a waiver of that failure the prosecutor's failure to call our attention to it. The rule requiring presentation of appellate issues first to the Court of Appeals is of no greater dignity than the constitutional prohibition of unreasonable searches and seizures. If an accused person's right to protection against impermissible searches and seizures can be waived by the carelessness or ineptitude of counsel, then, by like principle, the rule requiring that appellate issues be presented first to the Court of Appeals can be waived by the prosecutor's failure timely to call our attention to noncompliance with this rule.

Compliance with the rule requiring presentation of appellate issues first to the Court of Appeals is of great importance to this Court. Accordingly, we could remand the cause to the Court of Appeals for consideration of the search and seizure issue. Under the circumstances that we granted leave to appeal on all issues raised in the application for leave to appeal and, accordingly, should consider such issues, and that the search and seizure issue has been fully briefed, argued and considered at conference, we have chosen to consider and decide that pervasive issue.

---

[21] *See* fn 19.

[22] *See People v Garcia,* 398 Mich 250, 266; 247 NW2d 547 (1976); *People v Degraffenreid, supra,* pp 716, 718.

Opinion by LEVIN, J.

## IV

Crawl also contends it was error to permit the prosecutor to show that Howard Wilson, an important witness for the prosecution, had admitted his participation in the robbery-killing by pleading guilty to murdering the bartender, and had been sentenced.[23]

As a long-established rule of the common law, an accomplice's plea of guilty[24] or conviction following a trial[25] is not admissible against another person.[26]

---

[23] Although this claim of error was not preserved at trial, we advert to it because the issue is likely to arise on retrial and appears to be of recurring importance.

[24] *Leech v People,* 112 Colo 120; 146 P2d 346 (1944); *Babb v United States,* 218 F2d 538, 541 (CA 5, 1955); *Pryor v State,* 245 P 669, 672 (Okla Crim, 1926); *Moore v State,* 186 So 2d 56 (Fla App, 1966); *Lane v State,* 40 Ala App 174; 109 So 2d 758 (1959); *State v Jackson,* 270 NC 773; 155 SE2d 236 (1967); *Jackson v State,* 215 Ark 420; 220 SW2d 800 (1949); *State v Gargano,* 99 Conn 103; 121 A 657 (1923); *State v Pikul,* 150 Conn 195; 187 A2d 442 (1962); *People v Zachery,* 31 App Div 2d 732; 297 NYS2d 183 (1968); *Ward v Commonwealth,* 205 Va 564; 138 SE2d 293 (1964).

[25] *Leroy v Government of Canal Zone,* 81 F2d 914 (CA 5, 1936); *State v Jackson, supra; State v Frese,* 256 Iowa 289; 127 NW2d 83 (1964); *Gray v State,* 221 Md 286; 157 A2d 261 (1960); *People v Eldridge,* 17 Mich App 306, 313; 169 NW2d 497 (1969). *See, generally,* 22A CJS, Criminal Law, § 784, p 1190; Anno: *Prejudicial effect of prosecuting attorney's argument of disclosure during trial that another defendant has been convicted or has pleaded guilty,* 48 ALR2d 1016, 1017:

"Where two or more persons are jointly indicted for the same criminal offense which is in its nature several, or are separately indicted for such offense or for separate offenses growing out of the same circumstances, and are tried separately, the fact that one defendant has pleaded guilty or has been convicted is, as a general rule, inadmissible as against the other, since competent and satisfactory evidence against one person charged with an offense is not necessarily so against another person charged with the same offense, and since each person charged with the commission of an offense must be tried upon evidence legally tending to show his guilt or innocence."

[26] Rule 803(22) of the Federal Rules of Evidence, and the corresponding proposed Michigan rule, provide that a guilty plea of a witness other than the accused is inadmissible except for impeachment purposes.

On cross-examination, Wilson was asked about his statements to the police shortly after the robbery; the purport of the questioning was that Wilson made the statements in the hope of obtaining leniency. On redirect, Wilson was asked whether he had pled guilty and been sentenced; the people contend that these questions were responsive to the cross-examination and were asked to rebut the intimation that Wilson's testimony was motivated by self-interest.

While the cross-examination was limited to the time sequence shortly after the robbery, the tendency of the questions was not simply that Wilson had a personal motive for assisting the police but also that he had a personal motive for testifying against Crawl.

In these circumstances, the prosecutor was entitled to attempt to rebut the implication that Wilson's testimony was motivated by self-interest with evidence showing the nature of the concessions made to him.

Such disclosure should, however, be full and complete to avoid misleading the jury.[27] The disclosure here was far from adequate. The complete redirect examination was:

"*Q.* You have pled guilty to this matter already?
"*A.* Yes.
"*Q.* You are under sentence?
"*A.* Yes."

While Wilson had pled guilty "in this matter" and had been sentenced, he was allowed to plead guilty to a less serious offense than Crawl was then on trial for. Wilson had received a relatively light sentence in comparison to the sentence which

---

[27] *See People v Atkins,* 397 Mich 163; 243 NW2d 292 (1976).

Crawl faced on conviction of first-degree murder. Wilson, who admitted his participation in the robbery-killing, and, accordingly, faced conviction of first-degree murder and a mandatory sentence of life in prison without possibility of parole, was permitted to plead guilty to second-degree murder and was sentenced to serve a term of 5 to 15 years, which made him eligible for parole in approximately 3-1/2 years. Wilson was paroled in 1974, about 3 years after the crime was committed.

The implication of the redirect questioning, that Wilson had not benefited and would not benefit from his testimony and had no personal motivation to testify falsely, was misleading.

While Wilson had been sentenced, he was still subject to the jurisdiction of the parole board and whether he served a minimum or greater sentence depended in part on whether the authorities were of the opinion that he had been "rehabilitated". A person in his position might reasonably conclude that his chances of an early parole were greater if he continued to cooperate with the authorities by testifying against Crawl.

While the prosecutor was entitled to inform the jury of Wilson's true status, the jury should have been fully and accurately informed[28] of all the pertinent facts and circumstances so that it could properly assess whether his testimony may have been motivated by self-interest.

V

Crawl also contends that a confession introduced at the trial was involuntary because it was induced by a beating, promises of leniency and threats, including a threat to use ballistics tests on

---

[28] *See Hurd v People,* 25 Mich 405, 416 (1872).

the revolver seized from the barber bag to implicate him in the robbery-killing.

Following a *Walker* hearing held after the trial had begun, and after it had been decided that the evidence obtained from the barber bag had not been unlawfully seized, the judge ruled that the confession was voluntary.

Crawl's testimony that the police threatened to use the gun to tie him to the robbery was uncontradicted. If the confession was obtained as a fruit of the unlawful search and seizure, it must be suppressed.[29]

We would (see part II, *supra)* reverse the trial court on the search and seizure issue and remand for a new trial. Before such a new trial, the question whether the confession was a fruit of the unlawfully seized evidence should be reconsidered at an evidentiary hearing.

The other issues are without merit or not likely to arise at a new trial.

KAVANAGH, C. J., and FITZGERALD, J., concurred with LEVIN, J.

---

[29] *Wong Sun v United States,* 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963).