PEOPLE v GWINN

Docket No. 48233. Submitted May 13, 1981, at Lansing.—Decided
November 16, 1981. Leave to appeal applied for.

Oddis Gwinn was convicted of armed robbery, kidnapping, assault
with intent to murder, and four counts of first-degree criminal
sexual conduct. He subsequently pled guilty to being an habit-
ual offender, Bay Circuit Court, John X. Theiler, J. He appeals.

*Held:*

1. The record reveals that sufficient evidence was presented
to sustain the defendant's convictions of first-degree criminal
sexual conduct.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 65 Am Jur 2d, Rape §§ 3, 4, 116.

What constittues penetration in prosecution for rape or statutory
rape. 76 ALR3d 163.

[2, 3, 14] 65 Am Jur 2d, Rape §§ 63, 90.

[4, 16] 5 Am Jur 2d, Appeal and Error §§ 821, 838.

65 Am Jur 2d, Rape §§ 2–6, 116.

[5] 1 Am Jur 2d, Abduction and Kidnapping § 9.

[6, 17] 5 Am Jur 2d, Appeal and Error §§ 789, 800.

29 Am Jur 2d, Evidence § 373.

Admissibility of evidence as to extrajudicial or pretrial identifica-
tion of accused. 71 ALR2d 449.

[7] 29 Am Jur 2d, Evidence §§ 708, 717.

[8] 5 Am Jur 2d, Appeal and Error § 772 *et seq.*

[9, 10] 21A Am Jur 2d, Criminal Law §§ 802, 803, 974.

[11] 21 Am Jur 2d, Criminal Law § 193.

Validity and construction of statute requiring defendant in criminal
case to disclose matter as to alibi defense. 45 ALR3d 958.

[12] 39 Am Jur 2d, Habitual Criminals and Subsequent Offenders § 17
*et seq.*

63 Am Jur 2d, Prosecuting Attorneys § 26.

[13] 21 Am Jur 2d, Criminal Law § 527 *et seq.*

[15] 5 Am Jur 2d, Appeal and Error § 838.

[18] 21 Am Jur 2d, Criminal Law § 196.

[19] 81 Am Jur 2d, Witnesses § 507 *et seq.*

2. The trial court properly instructed the jury on the asportation necessary to support a conviction for kidnapping.

3. The record reveals that sufficient evidence was presented to allow the jury to convict the defendant of kidnapping.

4. The record reveals that evidence of the victim's reaction to the defendant's photograph at a photographic identification properly was admitted under an exception to the hearsay rule.

5. The record reveals that testimony by a third party regarding the victim's photographic identification of the defendant was merely cumulative, and, because the victim's identification was positive, reversal is not required.

6. The trial court, in its discretion, properly excluded certain relevant evidence as being more prejudicial than probative.

7. The trial court, in its discretion, properly denied the defendant's motion to conduct a lineup. The record reveals that there was little chance for mistaken identification by the victim and that there was an adequate, independent basis for an in-court identification of the defendant.

8. The trial court properly compelled an alibi witness to submit to a pretrial interview with the prosecutor pursuant to the purpose of the notice of alibi requirement contained in the Code of Criminal Procedure.

9. The record reveals that the prosecutor's comments to the jury during closing argument relative to an alibi witness's refusal to be interviewed by the prosecutor were not of such a nature as to require reversal.

10. The prosecutor's policy to charge all criminal defendants who had previous, provable Michigan felony convictions as habitual criminals does not constitute an abuse of discretion.

11. The comments by the trial court relative to possible sentences to be imposed upon the defendant upon conviction, while improper, do not constitute error requiring reversal.

12. The record reveals that the trial court properly individualized the sentences imposed on the defendant following consideration of a presentence report. In addition, the defendant was accorded the right of allocution, and the defense counsel was not limited in his presentation.

Affirmed.

R. M. MAHER, P.J., concurred in part and dissented in part. He would hold that although sufficient evidence to support a conviction of first-degree criminal sexual conduct was presented

on two independent grounds the general verdict does not reveal upon which ground the verdict was based, and because the prosecution's theory of mental anguish as a basis for the charge was not supported by the record, and because the jury may have based its verdict on that theory, the verdict should be set aside.

He also would hold that the trial court exceeded its authority in compelling an alibi witness to submit to an interview with the prosecution and that the prosecutor improperly attempted to discredit the witness by subsequently referring to the witness's failure to voluntarily submit to the interview during cross-examination of the witness and during closing argument.

He would reverse the defendant's conviction of first-degree criminal sexual conduct and would exclude evidence obtained as a result of the alibi witness's involuntary interview.

### OPINION OF THE COURT

1. RAPE — FIRST-DEGREE CRIMINAL SEXUAL CONDUCT — APPEAL — STATUTES.

A conviction of first-degree criminal sexual conduct may be sustained on appeal where the record reveals that the defendant engaged in sexual penetration with another person and was armed with a weapon or caused personal injury to the victim through the use of force to accomplish the penetration, including bodily injury or mental anguish (MCL 750.520b; MSA 28.788[2]).

2. RAPE — FIRST-DEGREE CRIMINAL SEXUAL CONDUCT — PERSONAL INJURY — STATUTES.

Evidence that a victim suffered scratches, bruises, and tenderness as a result of force used by a defendant to accomplish sexual penetration is sufficient to sustain a conviction of the defendant of first-degree criminal sexual conduct on the theory of bodily injury (MCL 750.520b; MSA 28.788[2]).

3. RAPE — FIRST-DEGREE CRIMINAL SEXUAL CONDUCT — MENTAL ANGUISH — STATUTES.

Evidence that a victim was kidnapped from her home, was subjected to repeated acts of sexual penetration under compulsion of a weapon and fear for her own safety and that of her children for two hours, was fired upon as she escaped from her assailant, and appeared emotionally disturbed following the incident and also days later is sufficient to establish the requisite mental anguish to sustain a conviction of first-degree criminal sexual conduct (MCL 750.520b; MSA 28.788[2]).

4. Rape — First-Degree Criminal Sexual Conduct — Mental
   Anguish — Appeal — Statutes.

A claim that proffered evidence of mental anguish was insuffi-
cient to support a conviction of first-degree criminal sexual
conduct must be considered on appeal in a light most favorable
to the prosecution, and where it is determined that no rational
juror could fail to find that the essential elements of the crime
were present beyond a reasonable doubt the conviction should
be affirmed (MCL 750.520b; MSA 28.788[2]).

5. Kidnapping — Asportation — Statutes.

A conviction of kidnapping may not be sustained where move-
ment of the victim was merely incidental to the commission of
another, lesser crime; movement sufficient to satisfy the aspor-
tation requirement for kidnapping must be incidental to the
commission of the kidnapping, irrespective of whether an un-
derlying lesser offense or a coequal offense is involved (MCL
750.529; MSA 28.797).

6. Evidence — Hearsay Evidence — Identification — Rules of
   Evidence.

Admission by a trial court of testimony by a witness regarding
the positive identification of a defendant by another witness
during a photographic identification constitutes error, but re-
versal is not required on appeal where the evidence was merely
cumulative (MRE 801[d][1]).

7. Evidence — Photographic Identifications — Hearsay Excep-
   tions — Rules of Evidence.

Testimony by a witness regarding the reaction of another witness
to a photograph of a defendant presented at a photographic
identification properly may be admitted as a present sense
impression, excited utterance, or a then-existing mental or
emotional condition of the identifying witness (MRE 803[1]-[3]).

8. Evidence — Exclusion of Evidence — Appeal.

Evidence determined to be relevant nevertheless may be excluded
where a trial court in its discretion determines that the proba-
tive value of the evidence is outweighed by its prejudicial effect,
and the determination of the trial court should not be dis-
turbed on appeal absent an abuse of discretion.

9. Criminal Law — Lineups — Judicial Discretion.

A trial court, in its discretion, may grant a criminal defendant's
motion to conduct a lineup where required by fundamental

fairness upon consideration of the benefits to the accused, the burden on the prosecution, police, courts, and witnesses, and the timeliness of the motion.

10. CRIMINAL LAW — LINEUPS — JUDICIAL DISCRETION.

A criminal defendant should be entitled to a lineup upon his motion where an eyewitness identification is shown to be a material issue and there is a reasonable likelihood of mistaken identification which the lineup would tend to resolve; however, where there is an adequate, independent basis for an in-court identification a trial court properly may refuse the defendant's request.

11. PRETRIAL PROCEDURE — CRIMINAL LAW — ALIBI WITNESSES — SUBPOENA — COURT RULES — STATUTES.

Discovery, such as is permitted by court rules in civil cases, relative to compelling answers to interrogatories or the presence of a witness at a deposition, is not available in criminal cases; limited discovery is available for the benefit of the prosecution in a criminal case pursuant to that section of the Code of Criminal Procedure which requires a criminal defendant to file a notice of alibi, including the names of corroborating witnesses, and such witnesses may be compelled to submit to interview by the police or the prosecutor prior to testifying (GCR 1963, 301-309, 785.1[2], MCL 768.20; MSA 28.1043).

12. PROSECUTING ATTORNEYS — PROSECUTORIAL DISCRETION — HABITUAL CRIMINALS.

A prosecuting attorney, in his discretion, may determine which charges should be brought against a criminal defendant, and a decision to file supplemental informations charging defendants as habitual criminals in all cases in which the prosecutor is aware of and can prove by documentation previous Michigan felony convictions is a proper exercise of discretion.

13. CRIMINAL LAW — SENTENCES — PRESENTENCE REPORTS — INDIVIDUALIZED PUNISHMENTS.

A trial court, in imposing sentence in a criminal case, must individualize the sentence to fit the offender, guided by complete and detailed information regarding the offender; thus, use of a presentence report by a trial court is necessary in order to prescribe informed, individualized punishments where felonies are involved.

PARTIAL CONCURRENCE AND PARTIAL DISSENT BY R. M. MAHER, P.J.

14. RAPE — FIRST-DEGREE CRIMINAL SEXUAL CONDUCT — PERSONAL INJURY — MENTAL ANGUISH — STATUTES.

*The prosecution should demonstrate that a victim suffered extreme or serious mental anguish in order to support a conviction of first-degree criminal sexual conduct on a theory of personal injury or mental anguish resulting from the use of force to accomplish sexual penetration (MCL 750.520b; MSA 28.788[2]).*

15. CRIMINAL LAW — VERDICTS — INSUPPORTABLE THEORIES — APPEAL.

*A jury verdict convicting a defendant in a criminal case which may have been based on an insupportable theory even though sufficient evidence existed to support the conviction on another basis should be reversed on appeal where the record does not reveal upon which theory the jury relied.*

16. RAPE — FIRST-DEGREE CRIMINAL SEXUAL CONDUCT — APPEAL — MENTAL ANGUISH — STATUTES.

*A conviction of first-degree criminal sexual conduct should be reversed on appeal where the prosecutor based his charge on a theory that the victim experienced mental anguish as a result of force used by the defendant to accomplish sexual penetration and he subsequently failed to demonstrate during trial that the victim had suffered to a greater extent than any other similar victim or had need of psychiatric care or that the experience interfered with the victim's ability to conduct a normal life, such as absence from the workplace (MCL 750.520b; MSA 28.788[2]).*

17. EVIDENCE — HEARSAY EVIDENCE — APPEAL.

*Testimony by a third party regarding the circumstances surrounding another person's prior identification of a criminal defendant should be admitted during trial; however, a third party should not be permitted to testify that another person previously identified an accused, but where such testimony is merely cumulative reversal should not be had on appeal.*

18. PRETRIAL PROCEDURE — CRIMINAL LAW — ALIBI WITNESSES — SUBPOENA.

*Evidence obtained by the prosecution as a result of an involuntary interview with a defendant's alibi witness in advance of trial should be excluded unless the defense is provided with a corresponding opportunity to compel interviews with prosecution witnesses.*

19. PROSECUTING ATTORNEYS — ALIBI WITNESSES — TRIAL TACTICS.

   *A prosecuting attorney should not attempt to discredit alibi witnesses by attacking during cross-examination of the witnesses or closing argument such witnesses' failure to report information to police.*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *George B. Mullison,* Prosecuting Attorney, and *Thomas J. Rasdale,* Assistant Prosecuting Attorney, for the people.

*Janet Tooley,* Assistant State Appellate Defender, for defendant on appeal.

Before: R. M. MAHER, P.J., and ALLEN and CYNAR, JJ.

CYNAR, J. Defendant was convicted after a three-week jury trial of armed robbery, MCL 750.529; MSA 28.797, kidnapping, MCL 750.349; MSA 28.581, assault with intent to murder, MCL 750.83; MSA 28.278, and four counts of first-degree criminal sexual conduct, MCL 750.520b; MSA 28.788(2). After conviction, defendant pled guilty to being a second-felony offender, MCL 769.10; MSA 28.1082. On August 7, 1979, defendant received sentences of life for kidnapping, life for armed robbery, from 20 to 40 years for assault with intent to murder, and from 40 to 60 years for each of the four counts of criminal sexual conduct. He appeals as of right.[1]

The charges arose after the complainant told

---

[1] Although only the prosecutor was scheduled for oral argument set for May 13, 1981, defense counsel filed a motion to adjourn oral argument. The motion was denied, but the defendant was granted 30 additional days to file a supplemental brief. Further, an extension was granted until July 11, 1981, to file a supplemental brief. No further extension was granted. Defense counsel did not file a supplemental brief. On July 22, 1981, defendant, acting *in propria persona,* filed a supplemental brief. Although late, we only accept the supplemental brief of July 22, 1981. Subsequent, untimely supplementation has not been considered by this Court. After careful consideration, we do not find any merit to the issues raised in the supplemental brief.

police that she had been taken from her trailer on the night of July 14, 1978, and forced to engage repeatedly in sexual acts. The defense was alibi and mistaken identification.

Defendant was arrested after complainant identified his picture from a book of photographs. Before the preliminary examination, defendant asked that a lineup be held for complainant. Before trial, defendant moved to suppress the photographic identification on grounds of suggestiveness and lack of counsel. These motions were denied.

Trial began on May 22, 1979. The complainant testified at length as follows: on July 14, 1978, at approximately 10 p.m., she was watching television in her living room. Her husband was at work, and her two daughters were in bed. At that point, she heard the screen door of her mobile home open and observed a man come into the trailer. She kept her eyes on him at all times because she was frightened by a gun being pointed at her. Her initial reaction was fear for her children and herself.

She identified the person with the gun as the defendant. Defendant asked complainant if anyone else was in the trailer and specifically asked when her husband got home. She told him to take her money and leave. She gave him $35 and her car keys. After she gave her car keys to defendant, defendant instructed complainant to come with him. In total, defendant was in the trailer for ten minutes.

When defendant entered the trailer, complainant was dressed in slippers, a pink nightgown, and a maroon-colored robe. While in the trailer, defendant wore gloves. The gun which defendant had was a short-barreled weapon.

Once outside the trailer, defendant and com-

plainant entered complainant's automobile. At this time, not only did defendant have a gun, but he had a knife as well. She stated that the reason she entered the car was because she was afraid of defendant because he had weapons.

Once in the automobile, defendant and complainant traveled eastbound on North Union for some distance, then turned right at the intersection of North Union and Flajole Road. They traveled on Flajole Road for a while, turned around, and headed in the opposite direction on the same road. Finally, they turned off Flajole Road onto a dirt road which led to a driveway on property owned by Dow Chemical. Complainant had her eyes on defendant at all times while in the automobile.

Once on the Dow Chemical property, defendant and complainant left the automobile. Defendant then forced complainant to take off her robe and gown. Defendant forced his penis into complainant's mouth. While this act was taking place, the knife was in defendant's hand, and the gun was lying on the ground.

At the completion of this act, defendant required complainant to lay on her back. Defendant then placed his penis in complainant's vagina. While this act was taking place, she felt defendant's knife pressing hard over her chest. She was asked by the prosecutor what her state of mind was when this act was taking place, and she answered that she felt angry, embarrassed, and humiliated, and that she hated defendant. While the sex acts were taking place, the lighting was sufficient for complainant to observe defendant's face.

After withdrawing his penis from complainant's vagina, defendant forced complainant to turn over so that she was lying on her stomach. With his

knife around complainant's neck, defendant forced her to submit to anal intercourse. At this point, she was asked to describe her mental state. She stated that she was frightened, angry, humiliated, and just felt awful, and that when she tried to push the defendant off her he pushed her head down onto the ground, injuring her nose and mouth.

After completing the anal intercourse, defendant led complainant back to the automobile. Defendant still had his gloves on. The complainant and the defendant got back into the automobile, drove on Flajole Road to Salzburg Road, turned left, and proceeded on that road until turning left on Carter Road. Again, the gun was in defendant's lap, and the knife was pointed at complainant. Again, complainant had her eyes on defendant. As they drove along, she said she wanted to go home. He asked about her children, and this frightened her since he also had her house key.

The automobile trip itself took about ten minutes. Once back at the mobile trailer park, complainant got out of the automobile and started to walk along a ditch with defendant. Defendant and complainant then walked behind some trailers and went to a pond covered by some tall weeds.

Once at the pond, defendant and complainant walked to the edge of it. Defendant removed his clothing and forced complainant to do the same. Defendant and complainant entered the water, and defendant forced complainant to wash herself and defendant.

After getting out of the water, defendant forced complainant on her knees. Defendant again placed his penis in complainant's mouth. At this moment she was upset and frightened as to what he would do when he was done. After withdrawing his penis

from her mouth, defendant forced complainant to lie down. He again placed his penis in her vagina. When asked what her thoughts were at this point, complainant stated that she hated defendant and wanted to kill him.

After this last act of sexual penetration, complainant noticed defendant's knife on the ground. She wanted to pick up the knife and kill defendant but was afraid she might only wound him and that this would anger defendant. She took the knife and threw it into the pond, reasoning that if she did not, defendant might stab her with the knife. If she was stabbed, complainant believed that she would lay there for a long time before she died. Complainant felt that if defendant had only the gun that he would shoot her, and at least somebody would hear it.

After the last act of sexual penetration, complainant was instructed by defendant to go into the water. She further was instructed to continue to walk until she was told to stop. Complainant thought that defendant was going to shoot her in the back.

However, complainant was allowed to come out of the water and get dressed. Defendant and complainant then entered the trailer park again. As they were walking in the trailer park, complainant heard some music, and she prayed that people outside would see her.

After observing some people, complainant decided to make a run for it. As she pulled away from defendant, she screamed for help. She took approximately 12 steps before tripping and falling. As she fell she heard a shot behind her. She then started crawling on her stomach on the grass toward the people. After a man helped her into a trailer where other people were laying on the

floor, there was concern about further shooting, and she was concerned about defendant going to her children.

Defendant and complainant had returned to the trailer park after midnight. Thus, complainant was with defendant for over two hours. She was able later to inspect a trailer in the area and to observe that there were scattered indentations of metal in that trailer. During cross-examination she agreed that by far this was the most stressful situation in her entire life.

There were numerous other witnesses who identified defendant as the person who shot at complainant. One of those persons was Richard LaFontaine. He was one of the persons who was sitting in the yard at the time that defendant and complainant approached the group. He noted that the shot pattern on the trailer indicated defendant shot from a shotgun. At the time that he identified defendant at a lineup, he testified that he was sure of his identification of defendant as the person who shot at complainant.

Another person to identify defendant as the person who shot at complainant was Julie Hammond. It was this witness who first observed defendant and complainant. She testified that there was very good lighting in the area and that it was light enough to see defendant's features. She also identified defendant at a lineup.

A third person to identify defendant as the person who shot at complainant was Sharon Boulden. She testified that she was certain of her identification and that there is no doubt in her mind that defendant was the person involved. Her husband, Chris Boulden, was also able to identify defendant both at a lineup and in court as the person who shot at complainant. He testified that he also was certain of his identification.

The record further reveals that after complainant was taken to safety in a trailer the police were called. During the investigation that night, a wooden forestock of a shotgun was found on the road. This forestock was found in the area between the Hammond and LaFontaine trailers. Footprints were found in the area of the Dow Chemical property. Wadding from a shell of a 20-gauge shotgun was also found in the area.

The investigation of the incident continued on July 17, 1979. At that time, divers were sent to attempt to locate the knife in the pond where complainant alleged that she threw it. Subsequently, that knife was found by the divers after complainant went to the area of the pond on July 17 and showed the officers where she threw it. The knife was approximately 12 inches long.

While at the pond, complainant was shown a book containing photographs. She picked out defendant's photograph as the person who committed the criminal offenses against her.

After complainant identified defendant as the perpetrator of the criminal offenses, police officers went to defendant's residence and arrested defendant. Defendant, at the time of his arrest, was allowed to go into his house to get medication. It was at this time that Detective Louis Gwizdala observed shoes on the floor which had a pattern similar to one of the sets of footprints found at the Dow Chemical property where the first incidents of criminal sexual conduct occurred. Subsequently, a search warrant was obtained and executed, and the shoes were seized. Earlier, photographs were taken of the footwear impressions at the Dow Chemical property.

The photographs of the footwear impressions and defendant's shoes were compared by Richard

Bisbing of the Bridgeport Crime Laboratory. He found that the defendant's right shoe could have made the right foot impression found at the Dow Chemical property. He also found that it was probably defendant's left shoe which made the left foot impression observed at the Dow Chemical property. Richard Bisbing was more certain of the left shoe having made the impression than he was the right shoe. The reason that he was more certain of the left shoe was that he had observed five individual characteristics, along with the class characteristics, of the left shoe and the footwear impression. For the right shoe, he had observed only three separate points of comparison. Richard Bisbing, previous to this case, had made approximately 100 comparisons of footwear impressions.

After the prosecution rested, defendant placed several witnesses on the stand. It was the testimony of David Bisio that defendant's shoes were Jaclar shoes. The tread design on defendant's shoes was the same as that on 9,950 pairs of shoes produced in 1978, of which 3,426 pairs were the identical type design as defendant's. Defendant's shoes, which were a size 11, would constitute 1 out of every 11 pairs of shoes produced. This witness had no idea as to how many shoes were sold in the tri-city area.

Another witness to testify for defendant was Wilbert Kleinsmith. It was his testimony that defendant's hair during trial was maybe just a little shorter than on July 14, 1978. He did testify that defendant got a haircut over the weekend of July 14, 1978. That haircut would have occurred after the incident involving complainant but prior to the arrest of defendant by the police officers.

Another witness for defendant was Dennis Jariett. It was his testimony that he drove past defen-

dant's house on his way to Midland on the evening of July 14, 1979, at approximately 11:30 p.m. and observed defendant's car and that the lights were on in the house. Dennis Jariett subsequently passed by defendant's house again at approximately 12:35 p.m. Dennis Jariett did admit that he did not actually observe defendant on the date of the incident. Dennis Jariett also admitted that the first time that he had talked to defense counsel about the incident he could not remember too much about it.

Janice Gwinn testified that the last time she observed defendant on July 14, 1978, was about 4:00 or 4:30 that afternoon. She testified that she went with Dennis Jariett to Midland and passed defendant's home at approximately 11:10 p.m. She noticed defendant's car there but did not observe any lights on in the house. Like Dennis Jariett, she had been drinking beer and smoking pot. They passed defendant's home at approximately 12:40 a.m., on July 15, 1978, and observed defendant's car there and no lights on in the house. She did admit that she would not speak to the police officers about the incident even though the police officers had requested an opportunity to speak with her regarding what she had observed. She also did testify that she did not remember all of what had occurred on July 14, 1978, only some of it. However, when she talked to Cindy McClary, certain things had come back to her mind. She also admitted that she did not actually observe defendant on the evening of July 14, 1978.

Another witness to testify for defendant was Joseph Ryan. He was the alleged expert whose testimony was offered to counter the testimony of Richard Bisbing of the Bridgeport Crime Laboratory. He testified that he had no training in foot-

wear tread design and that this was in fact the first footwear impression comparison he had made. The witness's testimony was that the shoes of defendant did not make the footwear impression.

The last witness to testify for the defense was defendant. He denied committing the offense. He testified that he read a book from 9:30 to 11:30 p.m. on the evening of July 14, 1978, and that he went to sleep at 11:30 p.m.

I

In closing arguments, the prosecution argued that first-degree criminal sexual conduct was established in one of three ways: by the use of a weapon, by bodily injury, or by mental anguish.

The jury was instructed that it could convict defendant of first-degree criminal sexual conduct if it found that complainant had suffered extreme mental anguish. The instruction stated:

"The people's theory is that under certain circumstances she sufferred [sic] an actual physical injury, but the people also contend that—and it is their theory— that Rebecca L. Dodge suffered a personal injury in that she sufferred [sic] mental anguish, so I will develop that for you in more detail.

"By statutory definition, personal injury can include mental anguish. To suffer anguish, to be distressed with extreme pain or grief, and it may be extreme pain either of the body or the mind. The statute here specifies mental anguish as being a form then of personal injury.

"The personal injury referred to her, which includes mental anguish, must relate to the suffering [sic] that occurred at the time of the act and be the result of the use of force or coercion to accomplish sexual penetration."

Adequate evidence of first-degree criminal sexual conduct was established under the weapons charge. Defendant carried a knife and a shotgun during most of the incident. Adequate evidence of bodily injury was also shown during trial. Complainant sustained scratches on her back, bruises on her nose, and tenderness in her perineal area, particularly around the anus. This showing of bodily injury was adequate to sustain a first-degree criminal sexual conduct conviction on the theory of bodily injury. *People v Hollis,* 96 Mich App 333; 292 NW2d 538 (1980), *People v Kraai,* 92 Mich App 398; 285 NW2d 309 (1979).

Defendant claims that there was insufficient evidence of mental anguish to support a first-degree criminal sexual conduct conviction. In reviewing this claim, the evidence must be considered in the light most favorable to the prosecution, and the verdict should be affirmed unless no rational juror could find the essential elements beyond a reasonable doubt. *People v Hampton,* 407 Mich 354; 285 NW2d 284 (1979).

In *People v Gorney,* 99 Mich App 199; 297 NW2d 648 (1980), a guilty-plea case, the extent of proof to support a factual basis for the element of mental anguish was an acknowledgement by defendant that the victim was upset. The Court held that the injury thereby shown did not rise to the level of mental anguish. While the *Gorney* Court suggested two factors that could establish the requisite mental anguish, the Court declined to attempt an exhaustive list, leaving this for later factual determination. *Id.,* 207.

In this case, the record supports submission of the mental anguish question for determination by the factfinders. A review of the trial transcript indicates that a jury could determine that the

complaining witness was home with two children of early years when a man entered her trailer with a gun. Fearing for her children's and her own safety, she gave him some money and keys to her car and, under force of a gun, left the trailer with him. During the two hours which elapsed, the complaining witness, under the compulsion of a knife and gun, was subjected to anal, vaginal, and oral intercourse. The sexual acts were at least five in number. She did not remember at times what she was saying but did recall being told to shut up by the assailant. When asked what she was experiencing at a particular moment when a sexual act was occurring, she stated that she was frightened, angry, humiliated, and just felt awful. During the time involved, she testified that she wanted to kill the defendant with the knife but was afraid of only wounding him, and later she prayed that people would see her as she walked into the trailer park. As she pulled away from defendant, she screamed for help. After she heard a shot behind her, she started crawling on her stomach toward the people. While laying on the floor in the trailer she was concerned about further shooting and about her children. She stated that this experience was by far the most stressful situation in her life. About an hour after the incidents occurred, when a doctor was examining her, she appeared sad and sobbed occasionally. She began to cry and scream two days later when viewing a photo of the defendant.

Adequate evidence was submitted for the jury to consider the charge of first-degree criminal sexual conduct under the theory of use of a weapon or of bodily injury. We had more here than a limited number of words submitted for the jury's consideration to establish mental anguish under the

charge of first-degree criminal sexual conduct. A review of the total record, and reasonable inferences to be drawn therefrom, indicates that adequate evidence was submitted to the jury to establish that first-degree criminal sexual conduct was committed in any of three ways: by the use of a weapon, by bodily injury, or by mental anguish.

## II

Defendant was charged and convicted of kidnapping. One element of this offense is movement of the victim, where that movement has a significance independent of lesser crimes charged. It is improper to convict a person of kidnapping if the movement is merely incidental to the commission of another, lesser crime. *People v Adams,* 389 Mich 222, 236; 205 NW2d 415 (1973).

In interpreting the first part of the Michigan kidnapping statute to avoid constitutional overbreadth, the *Adams* Court listed a number of factors to be considered, including the following:

"2. The movement element is not sufficient if it is 'merely incidental' to the commission of another underlying lesser crime.
"3. If the underlying crime involves murder, extortion or taking a hostage, movement incidental thereto is generally sufficient to establish a valid statutory kidnapping." *Id.,* 238.

*Adams* was silent on the standard to be applied in determining the asportation element of capital offenses other than as stated above. This Court has split when asked to determine whether the *Adams* rule for lesser crimes applies to coequal offenses. See *People v Friday,* 98 Mich App 522; 296 NW2d 618 (1980), *People v Lynn,* 91 Mich App 117; 283

NW2d 664 (1979), *People v Barker,* 90 Mich App 151; 282 NW2d 266 (1979), *People v Roger Harris,* 80 Mich App 161; 262 NW2d 912 (1977), *People v Worden,* 71 Mich App 507; 248 NW2d 597 (1976), and *People v Hardesty,* 67 Mich App 376; 241 NW2d 214 (1976).

The Supreme Court, after granting leave, decided this issue in *People v Barker,* 411 Mich 291, 300; 307 NW2d 61 (1981). Movement to satisfy the asportation requirement for kidnapping, whether an underlying lesser offense or coequal offense is involved, " 'must be incidental to the commission of the kidnapping' ".

In the case at bar, the jury was instructed on asportation as follows:

"Third, during the course of such confinement that defendant must have forceably moved or caused her to be moved from one place to the other for the purpose of abduction or kidnapping. Such movement is not sufficient if it is a part of a crime other than kidnapping. In this case, for example, you should consider whether or not the movement was for the purpose of kidnapping or whether it was a part of the crime of armed robbery, whether it was a part of a crime of armed robbery *[sic]* or whether it was a part of a sexual conduct in the first degree charge, or whether it was a part of an assault with intent to murder. There has to be a transportation or a movement forced upon Rebecca L. Dodge that was not a part of one of these other underlying crimes.

"In determining whether or not the movement was for the purpose of kidnapping, you may consider whether the movement was for a few feet or for any substantial distance, whether it added any greater danger or threat to Rebecca L. Dodge than the various underlying crimes that the defendant is charged with, or which were ongoing.

"However, the evidence must convince you beyond a reasonable doubt that there was a movement indepen-

dent of the other crimes and that it was for the purpose of kidnapping."

We find no error in the instruction. The properly instructed jury found defendant guilty of kidnapping.

Defendant argues that the evidence was inadequate to sustain this conviction. In determining the quantum of evidence needed to allow a jury to find asportation in *Lynn, supra,* the Court held that the evidence of movement of a ten-year-old victim to a "nearby" apartment was sufficient to permit a defendant to be bound over for trial. Similarly, in *Worden, supra,* this Court noted that a line of cases recognized the fact that moving a victim to a secluded spot increases the danger to the victim, so that the movement in such a case is not merely incidental to the crime charged. The *Worden* Court found that sufficient evidence was presented to support kidnapping and armed robbery convictions when the victim was driven one-quarter mile after an armed robbery, then released.

In *People v Jones,* 92 Mich App 100; 284 NW2d 501 (1979), defendant was charged with felonious assault, kidnapping, and breaking and entering an occupied dwelling with intent to commit a kidnapping. The Court held that a directed verdict of acquittal of kidnapping properly was denied because the evidence showed that the victim was forced to walk a distance, then was driven several miles to a deserted farm where defendant put brake fluid in his car and pointed a rifle at the victim. The victim then was returned to a spot near her home. The Court held that this movement was not merely incidental to the underlying offense of assault.

In the case at bar, testimony established that complainant was forced from her trailer at gunpoint, was driven by an indirect route to a brine well where the first sexual acts occurred, and was returned to an area near her trailer park where further assaults occurred. The movement to two different, secluded areas from an occupied trailer significantly enhanced the danger to complainant. Furthermore, we view at least the second movement as having independent significance since it was not necessary to undertake the second movement (from the well to the area near the trailer park) in order to facilitate further illicit sexual activity. This evidence was sufficient to permit a reasonable jury to find movement independent of the criminal sexual conduct and to convict defendant of kidnapping. *Hampton, supra.*

## III

Complainant testified that she selected defendant's photograph from a mug book, making a positive identification at the time. She did not describe her reaction to the photograph. Defense counsel moved, *in limine,* to exclude testimony by Louis Gwizdala, a police officer, concerning the complainant's identification of defendant's photograph. This motion was denied.

Gwizdala testified that complainant turned over three or four leaves from a mug book, then, "She let out a scream, yelled, 'that's the man. That's the man.'" Gwizdala said complainant began crying and that her husband "took her away". Devere Woods, another police officer, testified, over objection, that complainant selected defendant's photograph. He said she did not hesitate in her identification and began crying after she said, "That's him, that's him."

Defendant now argues that this evidence was admitted improperly under MRE 801(d)(1). That rule states:

"A statement is not hearsay if—

"(1) Prior statement of witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is one of identification of a person made after perceiving him * * *."

It is unclear whether this rule applies to testimony of a third party describing another's previous identification. In *People v Sanford,* 402 Mich 460; 265 NW2d 1 (1978), the Supreme Court discussed the rule, observing that it had been adopted after the trial in the *Sanford* case but split, in dicta, over whether this rule barred police officers' descriptions of a witness's out-of-court identification. Justice WILLIAMS, joined by Justices COLEMAN and MOODY, did not apply the rule at all but observed that officers testifying about others' out-of-court identifications were not testifying as to the truth of the identification but to the fact that it was made and to the circumstances surrounding it. Justice WILLIAMS noted, however, that this testimony may, in some cases, be barred as improper bolstering. *Id.,* 491. Justice RYAN, joined by Justice FITZGERALD, would apply the evidence rule and permit officers' testimony under it so long as the identifier testified during trial. Justices LEVIN and KAVANAGH would hold, however, that the rule is inapplicable to third parties and applies only to the testimony of the identifier.

Different panels of this Court have expressed disagreement about the holding and application of *Sanford.* In *People v Washington,* 84 Mich App 750, 756; 270 NW2d 511 (1978), this Court cited

the court rule and the concurring opinion of Justices LEVIN and KAVANAGH and concluded that a third party may not testify about another person's out-of-court identification. In *People v Hoerl*, 88 Mich App 693, 701-702, fn 5; 278 NW2d 721 (1979), another panel concluded that a third party's testimony was not covered by the court rule.

In *People v Adams*, 92 Mich App 619, 626; 285 NW2d 392 (1979), the Court held that an officer's testimony about a photographic identification was inadmissible under prior Michigan law but that under the court rule it was admissible, citing *Sanford*. In *People v Horton*, 98 Mich App 62, 71; 296 NW2d 184 (1980), *vacated on other grounds* 410 Mich 865 (1980), this Court followed Justice WILLIAMS and observed that descriptions of the circumstances could be permitted within the discretion of the court, although prior identification could be barred as impermissible bolstering of testimony.

In the case at bar, however, testimony about the complainant's reaction to the photograph of defendant was admissible. Her crying after viewing this photograph does not qualify as a "statement" under MRE 801(a), as the crying was not intended as an assertion. Evidence of the crying therefore was not hearsay and could be admitted. Even if the crying was intended as an assertion, testimony about that crying would be permitted under MRE 803(1)-(3), as it would be a present sense impression, an excited utterance, or a then-existing mental or emotional condition.

Since identification of defendant's photograph by complainant was positive, testimony that repeated the fact of identification was merely cumulative. No error requiring reversal occurred.

## IV

Defendant presented a defense of mistaken identification. In support of this defense, he offered two pieces of evidence: (1) that the victim of a nearly identical crime, which the police thought was committed by the same person, did not identify defendant in a lineup, and (2) that the victim of a crime which defendant could not have committed positively identified him in a lineup, even though the real culprit was also present. Defense counsel began to present this evidence and was met by an objection by the prosecution. Defendant made an offer of proof, and the trial court ruled that testimony about the two lineups in other cases would not be admitted during trial.

Defense counsel continued and inquired about the identification of a person other than defendant by the victim of a similar crime which the police suspected was committed by the same person as the crime in question. Testimony regarding the identification of another individual, not the defendant, was admitted without objection.

The defense also presented the expert testimony of Robert Buckout to attack the validity of eyewitness identifications in general.

On appeal, defendant argues that he was denied the right to present a defense. We disagree. Defense counsel vigorously argued mistaken identification and pointed out inconsistencies in the various witnesses' descriptions of defendant and their inability to positively identify defendant in a lineup. Moreover, defendant was able to present the lengthy expert testimony of Dr. Buckout. While defendant was precluded from presenting testimony by two victims of unrelated crimes, the substance of this testimony was before the jury in the form of the police officer's testimony.

On appeal, this Court should not disturb the trial court's decision unless it was clearly erroneous and indicates an abuse of discretion. *People v Flores,* 92 Mich App 130, 134-135; 284 NW2d 510 (1979).

The trial court in this case ruled that this evidence could be excluded under MRE 403, which provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The trial court properly excluded this testimony. There was no error.

V

Defendant moved two days before the preliminary examination for a lineup, asking that the complainant be given an opportunity to select defendant from a lineup. The prosecutor argued that it would be difficult to find a sufficient number of people similar to defendant to have a lineup that was not unduly suggestive. The prosecutor also suggested that the motion was untimely, that the victim was with defendant for about two hours, and that the victim had selected a photograph of defendant from a mug book which was not suggestive. The prosecutor asked that the motion be denied.

The trial court rejected the argument that the motion was untimely but found that because the victim had been with the attacker for one to two

hours there was little danger of mistaken identification, so there was no need for a lineup.

Defendant argues that the photographic identification was suggestive, and, therefore, a more reliable form of identification was necessary. Defendant raised the argument of a suggestive photographic showup in a pretrial motion (motion filed November 1, 1978). No lower court order directly addressed this issue, although an opinion filed August 8, 1979, states that there was no suggestive pretrial identification. The bulk of that opinion deals with the other eyewitnesses' observation of a lineup of defendant.

Michigan law permits a trial court to grant a defendant's motion for a lineup if the court chooses to do so in an exercise of its discretion. *People v Watson,* 52 Mich App 211; 217 NW2d 121 (1974), *rev'd on other grounds* 396 Mich 870 (1976), *People ex rel Ingham County Prosecutor v East Lansing Municipal Judge,* 42 Mich App 32; 201 NW2d 318 (1972). This rule is the same as that stated in *Evans v Superior Court of Contra Costa County,* 11 Cal 3d 617, 625; 114 Cal Rptr 121; 522 P2d 681 (1974). In that case, the California Supreme Court held that there is a due process right to a lineup "in an appropriate case". The Court held, however, that it was within the discretion of the trial judge to determine whether fundamental fairness requires a lineup. The Court directed lower courts to consider the benefits to an accused, the burden to the prosecution, police, courts, and witnesses, and the timeliness of the motion involved. The Court pointed out that a right to a lineup should arise when eyewitness identification has been shown to be a material issue and when there is a reasonable likelihood of mistaken identification which a lineup would tend to resolve.

In the case at bar, the accuracy of the identification was undoubtedly a material issue. The prosecution and defense disagree over whether there was a reasonable likelihood of mistaken identification based on the photographic showup.

Complainant testified that she leafed through about five pages of the mug book, each of which contained approximately ten photographs. She said that she selected a photograph of defendant because it had "similar hairstyle and characteristics". She said that nobody else in the book looked like defendant, that there was not even a "close second choice". She denied that there had been any preliminary discussion which suggested that the perpetrator of the crime was among those whose photographs were in the book. All the photographs were of men; some were black and white photographs, some were in color. The complainant's identification of defendant's photograph was positive.

In the present case, the victim spent from one to two hours with her attacker and was able to observe him in artificial light in the trailer, by the light of the half moon, and by the light of street lights in the trailer park. Her identification through these proceedings was positive. There was little chance of mistaken identification by the complainant where there was an adequate, independent basis for an in-court identification. There was, therefore, no abuse of discretion in refusing defendant's request to have the complainant view him in a lineup.

VI

Before resting its case, the prosecution moved to strike Janice Gwinn as an alibi witness because she had refused to submit to a police interview

before trial. Defense counsel stated that the witness had consulted him and that he had told her that it was up to her to decide whether or not to talk.

Over defendant's objection, the trial court ordered the witness to submit to an interview, saying that he was so ruling because defense counsel had advised the witness of her right to remain silent.

In cross-examining Janice Gwinn, the prosecutor inquired into her refusal to talk to police and the fact that she did not talk to police until ordered to do so by the court. No objection was made to this line of inquiry. During closing argument, the prosecution argued that Janice Gwinn was unworthy of belief because she had to be ordered to talk to the police. Defense counsel objected to this, but his objection was overruled.

The complained-of testimony and final argument took very little time during this three-week trial and appears to have played a very small part in the trial.

Discovery is permitted in civil matters under Chapter 30 of the court rules. Discovery is allowed under limited circumstances: a party may request that depositions or interrogatories be answered and may subpoena a person for the purpose of taking a deposition. GCR 1963, 301-309. GCR 1963, 785.1(2) expressly exempts criminal matters from the scope of the Chapter 30 discovery proceedings.

The Legislature has, however, provided certain limited discovery tools for the benefit of the prosecution. Among these tools is MCL 768.20; MSA 28.1043, which requires a defendant to file a notice of alibi, listing the names of witnesses and their addresses. This notice permits a prosecutor to investigate the alibi defense before trial. *People v*

*Merritt,* 396 Mich 67; 238 NW2d 31 (1976). The statute is silent on the right of the prosecutor or a court to compel a potential alibi witness to submit to an interview.

The prosecutor argues that such discovery should be allowable, as it is within the trial court's discretion to order a witness to speak to an attorney in a criminal matter. The prosecution cites the general rule that is applicable to discovery for the benefit of defense in a criminal matter. *People v Bailey,* 101 Mich App 144, 152-153; 300 NW2d 474 (1980). The discovery that is available for the defense is present to ensure that a defendant has a fair trial. It is the purpose of the notice of alibi statute to provide a prosecutor with a similar tool. It would appear to us that the issuance of a subpoena would be in order upon a request by the police that an alibi witness be interviewed.

During cross-examination, the prosecution brought out the fact that Janice Gwinn had refused to talk to police until ordered to so do by the court. This testimony was admitted without objection, therefore, appellate review normally would be precluded in the absence of manifest injustice. *People v Crawl,* 401 Mich 1, 31; 257 NW2d 86 (1977).

In this case, the alibi witness was approached by police and declined to comment. The witness's reluctance in this case is understandable in light of her close association with, and eventual marriage to, defendant. Janice Gwinn was the only witness who corroborated defendant's alibi. However, the prosecutor's right to inquire into the relationship between the witness and defendant should not be restricted in attempting to show the witness's interest or bias.

Any action of the trial court in the event that

the witness had refused to be interviewed by the police after the court ordered her to be interviewed is not a question before us. We do not find the action of the trial court in ordering Janice Gwinn to talk to the prosecutor before testifying nor the prosecutor's comments to the jury on this order of such a nature as to require reversal.

## VII

During arguments on the pretrial motion to dismiss the supplemental information, the prosecutor stated that a supplemental information is filed in all cases where the prosecutor's office is aware of a previous Michigan felony conviction and can prove that conviction by a certified copy of a journal entry, sentencing transcript, plea transcript, or other documentation. The assistant prosecutor indicated that he knew of no case where this policy had not been followed.

Defendant argues that this flat charging policy is a refusal to exercise discretion and punishes a defendant for the "status" of being an habitual offender. The prosecution points out that many supplemental informations filed in Bay County are later dismissed or reduced. In the instant case, defendant's supplemental information was reduced from charging a third-felony offense to a second-felony offense. This is some evidence that the prosecutor was in fact exercising a degree of discretion in prosecuting habitual offenders.

Much confusion has existed in the interpretation of *People v Fountain,* 407 Mich 96; 282 NW2d 168 (1979), prior to and since the decision in *People v Young,* 410 Mich 363; 301 NW2d 803 (1981). There are some who contend the supplemental information must be filed no later than the arraignment on the information. Others maintain that the sup-

plemental information is required to be filed before the conviction. It would appear that a cautious prosecutor would adopt a broad policy of filing supplemental informations at the time of an arraignment in order to ensure the availability of that charge, should it be deemed appropriate under the circumstances of any particular case. The *Fountain* decision severely limits the discretion that a prosecutor may exercise at the time of charging offenses; it does not, however, bar a prosecutor from reducing or dropping the charged offenses at a later point.

A decision to determine which charges should be brought rests within the discretion of the prosecutor. The prosecutor's policy decision to charge all criminal defendants did not constitute an abuse of discretion but allowed a proper exercise of it.

## VIII

The last issue submitted for our determination is raised for the first time on appeal and therefore is not a proper ground for reversal absent manifest injustice.

Defendant now claims that he must be resentenced by another judge because the trial court prejudged his sentence without the benefit of proper sentencing information and the right to allocute. *People v Provience,* 103 Mich App 69; 302 NW2d 330 (1981).

The trial transcript indicates that late in the afternoon of the fourth day of trial, during the presentation of the prosecution's case, the jury was excused for the day and that respective counsel discussed several matters with the court on the record. On a date prior thereto, the trial court entered an order, *in limine,* to exclude reference to

defendant's prior conviction for rape but permitted reference to a prior conviction for breaking and entering. During the argument, the prosecutor suggested in conjunction with the issue raised that a person with a previous felony conviction would have a greater interest in not telling the truth and in not being convicted, compared to a person who has no previous felony conviction. While we consider the court's remarks which followed as improper, they do not constitute error requiring reversal under the circumstances of this case. The court stated:

"Why would that be true here? If he's convicted, I'm going to sentence him to two life terms. After you get wet, can the water make you any wetter?"

Following further argument, the trial judge excluded reference to defendant's prior convictions for rape and breaking and entering.

The trial continued through eight additional trial days. After the jury returned guilty verdicts, a motion for a new trial was heard and denied. Prior to sentencing, defendant was accorded his right of allocution, and defense counsel was not limited in his presentation. In reference to the presentence report, the trial judge inquired and defense counsel responded that he did not find anything improper or incorrect, nor was there anything to be decided, added, or otherwise explained.

In imposing a sentence, a judge is required to individualize the sentence to fit the offender. To do so, he should have complete information available to him. *People v Chapa,* 407 Mich 309; 284 NW2d 340 (1979), *People v McFarlin,* 389 Mich 557; 208 NW2d 504 (1973). The Court in *People v Triplett,* 407 Mich 510, 514; 287 NW2d 165 (1980), held that

a presentence report is necessary in order to prescribe "informed, individualized punishment in felony matters".

The trial judge stated the basis for imposing the sentences. After advising defendant of his rights of appeal, the trial court indicated that it endeavored to handle each case before it on an individual basis and that it did so in this case. We find no error requiring reversal.

Affirmed.

ALLEN, J., concurred.

R. M. MAHER, P.J. *(concurring in part; dissenting in part).*

## I

Defendant was convicted of first-degree criminal sexual conduct. MCL 750.520b(1)(f); MSA 28.788(2)(1)(f) provides that:

"SEC. 520b. (1) A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:

* * *

"(f) The actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration."

"Personal injury" is defined in MCL 750.520a(f); MSA 28.788(1)(f) as:

"bodily injury, disfigurement, mental anguish, chronic pain, pregnancy, disease, or loss or impairment of a sexual or reproductive organ."

In *People v Gorney,* 99 Mich App 199, 207; 297

NW2d 648 (1980), cited by the majority, this Court held that the prosecution must show that the complainant suffered "extreme" or "serious" mental anguish in order to support a conviction under a "personal injury-mental anguish" theory. In the case at bar, the prosecution failed to present sufficient evidence of extreme mental anguish under the *Gorney* standard. Although there was sufficient evidence to support a conviction of first-degree criminal sexual conduct on two independent grounds, it is impossible to tell from the general verdict which ground was relied upon by the jury. Generally, where a jury may have based its decision on an insupportable theory, its verdict must be set aside. See, *e.g., People v Flinnon,* 78 Mich App 380, 386; 260 NW2d 106 (1977). Therefore, I must respectfully dissent from the majority's holding on Issue I.

The majority insists that there was sufficient evidence of extreme mental anguish under the *Gorney* standard. Undoubtedly, complainant experienced considerable mental distress as a result of the assault. However, complainant's reaction to the assault was comparable to the mental anguish, outrage, and humiliation typically experienced by *any* rape victim. In order to support a conviction of first-degree criminal sexual conduct under a "mental anguish" theory, the prosecution must show substantially greater mental suffering by the complainant than the distress experienced by most such victims. In *Gorney, supra,* 207, this Court listed two possible factors which would justify a conviction under a "mental anguish" theory: (1) "the need by the victim for psychiatric care"; or (2) "interference with the victim's ability to conduct a normal life, such as absence from the workplace". Since the prosecution failed to demonstrate that

the instant complainant experienced the degree of
mental anguish regarded as necessary by the *Gor-
ney* Court, I would reverse.

## II

As I noted in *People v Washington,* 84 Mich App
750, 756; 270 NW2d 511 (1978), the admissibility of
third-party identification testimony is limited to
testimony by a third party as to the circumstances
surrounding another person's prior identification;
a third party may not testify that another person
previously identified the accused. See *People v Poe,*
388 Mich 611; 202 NW2d 320 (1972), *People v
Londe,* 230 Mich 484; 203 NW 93 (1925), *cf. People
v Sanford,* 402 Mich 460; 265 NW2d 1 (1978)
(dictum). However, I agree with the majority that,
under the circumstances of this case, the third-
party identification testimony was merely cumula-
tive. Since I believe that the trial court's failure to
exclude this testimony was harmless error, I con-
cur in the result reached by the majority on Issue
III.

## III

The trial court ordered defendant's alibi witness,
Janice Gwinn, to submit to a police interview
against her will. To make matters worse, the
prosecutor attempted to establish through closing
argument and cross-examination of Janice Gwinn
that her failure to submit voluntarily to a police
interview indicated that she was unworthy of be-
lief.

First of all, the trial court's interview order was
clearly beyond its authority. As defendant cor-
rectly points out, no statute, rule, or appellate
court decision requires a defense witness to volun-

teer evidence to the state in advance of trial. See *People v Kraai,* 92 Mich App 398; 285 NW2d 309 (1979). Moreover, such a discovery order is unfair unless the defense is provided with a corresponding opportunity to compel prosecution witnesses to submit to interviews. Any evidence obtained as the result of such an involuntary interview should be excluded.

It was also improper for the prosecution to argue that Janice Gwinn's failure to submit willingly to a police interview rendered her unworthy of belief. As this Court pointed out in *Kraai, supra,* 411, the prosecution must not attempt to discredit alibi witnesses by attacking such witnesses' failure to report information to the police. Manifestly, the trial court's improper discovery order, compounded by the prosecution's impermissible closing argument, necessitate a reversal; therefore, I must respectfully dissent from the majority holding on Issue VI.

## IV

During a discussion in chambers, in response to a prosecutorial contention that convicted felons would have a greater interest in not telling the truth and not being convicted than nonfelons, the trial court stated:

> "Why would that be true here? If he's convicted, I'm going to sentence him to two life terms. After you get wet, can the water make you any wetter?"

Although the trial court well may have been speaking hypothetically, it is also possible that this statement reflected a sentence determination prior to examination of a current presentencing report. Such a predetermination effectively may deny a

defendant his right to consideration of a presentence report; see *People v Triplett,* 407 Mich 510; 287 NW2d 165 (1980). Certainly, such commentary by the trial judge should be carefully avoided. However, since defendant, after conviction, failed to request sentencing before a different judge, I concur in the result reached by the majority.

I join sections II, IV, V, and VII of the majority opinion.